Mrs. Leonor Maria Chirinos de ALVAREZ, Individually and as Personal Representative of the Estate of Telesforo Alvarez, Deceased, Plaintiff,

v.

CREOLE PETROLEUM CORPORATION, Defendant.*

Civ. A. No. 77–347.

United States District Court, D. Delaware.

Dec. 15, 1978.

* Consolidated With: *de Valero v. Creole Petroleum*, No. 77–348; *de Marin v. Creole Petroleum Corp.*, No. 77–349; *de Fereira v. Creole Petroleum Corp.*, No. 77–350; *de Valero v. Exxon Corp.*, No. 78–5; *de Alvarez v. Exxon Corp.*, No. 78–6; *de Fereira v. Exxon Corp.*, 78–7; *de Marin v. Exxon Corp.*, No. 78–8.

Arthur Inden, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Marvin I. Barish, of Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for plaintiff.

Peter M. Sieglaff, of Potter, Anderson & Corroon, Wilmington, Del., Daniel J. Dougherty, and Douglas G. Cameron, of Kirlin, Campbell & Keating, New York City, for defendant Creole Petroleum Corp.

Allen M. Terrell, Jr., of Richards, Layton & Finger, Wilmington, Del., George D. Byrnes, Exxon Corp., New York City, for defendant Exxon Corp.

STAPLETON, District Judge:

The widows of four men who died in an explosion brought these actions, individually and as the personal representatives of their husbands' estates, against the Creole Petroleum Corporation ("Creole")[1] and the Exxon Corporation ("Exxon")[2] to recover damages for their husbands' deaths. Both Creole and Exxon have moved to dismiss the complaints against them for lack of subject matter jurisdiction and failure to state a claim upon which relief could be granted, or, alternatively, under the doctrine of *forum non conveniens*. Exxon also contends that it is not a proper party to the actions. Because all of the actions arose out of the same occurrence, the parties agreed that Creole's and Exxon's motions in each of the actions would be considered together.

## I. FACTS.

As part of its oil exploration and production operation in Venezuela, Creole owned and operated a gas compression/reinjection plant, which was located on a fixed platform in Lake Maracaibo. Creole also owned and operated crew launches for the purpose, *inter alia*, of transporting personnel to and from the reinjection plant. Decedents Telesforo Alvarez, Rigoberto Valero, Santiago Marin and Ramiro Antonio Fereira were Creole employees. On November 17, 1975, they were aboard one of Creole's crew launches in the vicinity of the reinjection plant when an explosion and fire occurred, resulting in their deaths.

In their complaints, the plaintiffs allege that the crew launches were vessels and that the decedents were seamen and members of the crew of the vessels. In their suits against Creole, the plaintiffs allege that the decedents' deaths were caused by the negligence of Creole, by the unseaworthiness of the vessels, and by Creole's failure to provide maintenance and cure. They seek to recover from Exxon by virtue of Exxon's 100 percent ownership of Creole.

1. Civil Action Nos. 77–347, 77–348, 77–349 and 77–350.

2. Civil Action Nos. 78–5, 78–6, 78–7, 78–8 and 78–9.

Creole was incorporated in Delaware in 1920 by parties having no interest in the current litigation. During the Twenties it acquired an equity interest in substantial hydrocarbon acreage in Lake Maracaibo. Since that time Creole has been engaged exclusively in the business of crude oil exploration, production and refining in Venezuela. All of its properties and operating facilities are located there. Its corporate headquarters are in the Creole Building in Caracas, Venezuela. During the period between 1970 through 1975, Creole sold between 6% and 7% of its production for consumption in Venezuela. One third of its crude oil and petroleum products were sold for export to the United States while the remainder was sold for export to other countries around the world. All Creole oil sold for export was sold F.O.B. Venezuela.

At all times here relevant, Creole did no business in Delaware nor did it maintain an office in Delaware other than that of its registered agent for service of process. It did, however, maintain an export sales office in New York and was registered to do business in that state. This office negotiated most of Creole's contracts for export sale, although the decision on all major contracts was made by the Board of Sales Committee in Caracas.

Five of Creole's six officers on the date of the accident were United States citizens; one was a citizen of Venezuela. Four of the five United States citizen officers lived in Caracas. Of Creole's seven directors on the date of the accident, four were United States citizens and three were Venezuelan citizens. Three of the four United States citizen directors lived in Caracas. Meetings of the board of directors were held monthly, with eight meetings per year held in Caracas and four per year in New York. Creole held its annual shareholders meeting in New York City at the headquarters of Exxon and published its annual reports in English.

Exxon's predecessor acquired a majority interest in Creole in April of 1928. By the time of the accident, Exxon owned 100% of the stock of Creole. No officer or director of Exxon was an officer or director of Creole, however.

The plaintiffs are residents and citizens of Venezuela, as were their decedents. All of the employment contracts between the decedents and Creole were written in Spanish and signed in Venezuela. They contemplated payment in Venezuelan bolivares.

Each of the plaintiffs has received indemnification for the death of her decedent from the Inspector of Labor in the State of Zulia, Venezuela. Each of the indemnification agreements, which the plaintiffs signed, states that the indemnification is:

> pursuant to the provisions in numbers 1 and 4 of Article 148 of the Labor Laws, and in accordance with articles 38, 149 and 151 *ejusdem* and Clauses 24 and 25 of the Collective Bargaining Agreement dated July 20, 1973, between Creole Petroleum Corporation and the Federation of Workers of Venezuela and the Federation of Workers in the Hydrocarbon and Derivatives Industries of Venezuela.

Article 38 of the Labor Laws of Venezuela provides that, upon the death of a worker, his beneficiaries shall be entitled to indemnification. Article 151 provides that:

> The employer shall be exempt from all responsibility through the payment of indemnity to the relatives of the victim who may have claimed it within three months following his death.

> Once this period is over, the other relatives of the victim shall only have the right to claim their part from the relatives who have received the indemnity.

> In every case, the employer is exempt from responsibility after two years, counting from the death of the worker.

Clause 41 of the Contract with Labor Unions Entered into on July 20, 1973, Between Creole Petroleum Corporation and the Federation of the Hydrocarbons and Derivatives' Workers of Venezuela states that Creole agrees to pay by reason of indemnity for the death of a worker the amount that it is obligated to pay pursuant to the Labor Law.

The crew launches involved in the fire incident had Venezuelan certificates of registration and special permits entitling them to operate only in the internal waters of Venezuela.

## II. THE ISSUE.

The plaintiffs assert claims under the Jones Act [3] and the United States general maritime law. They expressly disavow any desire to have this Court consider any claim they may have under the law of Venezuela.[4] Moreover, I do not understand plaintiffs seriously to contend that the factors by which *forum non conveniens* issues are to be determined under *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), do not weigh in favor of Venezuela if the governing law is determined to be that of Venezuela. Thus, the controlling question is whether the Jones Act and the United States general maritime law apply to the factual situation alleged in the complaints. If neither does, then dismissal is appropriate whether it be because Venezuela is a more convenient available forum or because the Court cannot grant relief on the only claims plaintiffs chose to assert.

I have jurisdiction under 28 U.S.C. §§ 1331 and 1333 to determine whether the law relied upon by plaintiffs confers any rights upon them.

## III. ANALYSIS.

▮▮▮ Despite the "catholicity of its terminology," the Jones Act does not confer a right upon every seaman in the world who suffers injury in the course of his employment.[5] The same can be said of our general maritime law.[6] The question in each case is whether the United States has a sufficient interest in the transaction allegedly giving rise to liability to warrant application of our rules of decision to it. The sufficiency of that interest must be evaluated both from the standpoint of due process and from the standpoint of Congressional intent. *DeMateos v. Texaco, Inc.*, 562 F.2d 895 (3d Cir. 1977). Given the fact that Creole is a Delaware corporation, I do not doubt that Congress has the power to impose liability on it in circumstances of this kind without offending the Due Process Clause. The crucial question is whether Congress intended to do so.

In *Lauritzen v. Larsen*,[7] the Supreme Court cautioned that the courts should not ascribe to Congress an intention to give extraterritorial effect to its acts where such effect would be contrary to the conventions of international law. In *Lauritzen* and subsequently in *Helenic Lines Limited, et al. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the Supreme Court commented on some of the factors which "alone or in combination are generally conceded to influence choice of law to govern a tort claim . . . and the weight and significance accorded them" in various circumstances.[8] The factors commented on were: (1) the place of the wrongful act, (2) the flag, (3) the allegiance or domicile of the injured, (4) the allegiance of the shipowner, (5) the place of any contract governing the transaction, (6) the inaccessibility of a possible foreign forum, (7) whether the defendant is doing business within the forum state,[9] and (8) the base of the operation giving rise to the alleged liability. Each of these factors, except the 5th and 7th, were

---

**3.** 46 U.S.C. § 688.

**4.** Transcript pp. 60–61.

**5.** *Lauritzen v. Larsen*, 345 U.S. 571, 576, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).

**6.** *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959).

**7.** 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).

**8.** 345 U.S. at 583, 73 S.Ct. at 928.

**9.** This factor is discussed in *Lauritzen* under the heading "The Law of the Forum." This heading is somewhat misleading, however. In that section of its opinion, the Court concluded that the mere act of doing business within the forum's boundaries does not give rise to a sufficient interest on tne part of the forum nation to warrant application of its own rules of decision to actions brought against the defendant in that forum.

said to be entitled to weight, depending on the overall circumstances, in determining the substantiality of the national interests involved and the likelihood that Congress intended United States law to apply. The place of any governing contract was held in *Lauritzen* to be without "substantial influence in the choice between competing laws to govern a maritime tort." Similarly, the fact that the defendant does business in the forum state, in itself, was found not to demonstrate that the forum state had a sufficient interest to warrant application of its own rules of decision.

Disregarding the fact that Creole "does business" through its New York sales office, as I believe *Lauritzen* teaches I must do,[10] the only factor in this case which would support an application of United States law is the allegiance of the shipowner. Creole concededly is a Delaware corporation. But each of the plaintiffs' decedents was a Venezuelan citizen who was working at the time of the accident on a Venezuelan registered vessel in waters over which Venezuela has exclusive sovereignty. Venezuela is the most accessible forum for plaintiffs and Creole is subject to service of process there. Finally, the business operation from which the alleged liability arises was based in Venezuela.[11]

10. I have, of course, considered the evidence regarding the operations of the New York office along with all of the other evidence in determining the base of the operation which allegedly gives rise to liability.

11. Plaintiffs urge that the relevant base of operations is the United States because Creole is alleged to be operated as a "division" of Exxon and as an "agent" of Exxon in Venezuela. The record does not demonstrate that Creole was operated as a division or, in any relevant sense, as an agent, of Exxon, but, in my view, it would make no difference if it did. The necessary implication of plaintiffs' argument is that the law of the domicile of a multinational business would govern its liability regardless of the location and character of the particular business venture in the course of which the alleged liability arose. The Third Circuit recognized in *DeMateos v. Texaco, Inc.*, 562 F.2d 895 (3d Cir. 1977) that such an approach involves consideration of the "connecting factors between the *shipping transaction regulated* and the national interest served by the assertion of authority."

Plaintiff's principal argument is that Creole's United States domicile alone is sufficient to warrant the application of our rules of decision. In support of their contention, plaintiffs cite 46 U.S.C. § 713, which broadly defines "seaman" as every person employed on a ship belonging to any citizen of the United States,[12] and the following authorities: *Gerradin v. United Fruit Company*, 60 F.2d 927 (2d Cir.), *cert. denied* 287 U.S. 642, 53 S.Ct. 92, 77 L.Ed. 556 (1932); *Carroll v. United States, et al.*, 133 F.2d 690 (2d Cir. 1943); *Rode v. Sedco, Inc., et al.*, 394 F.Supp. 206 (E.D.Tex.1975); *Ramirez v. Zapata Off-Shore Company, et al.*, C.A. No. 73–A–1239 (S.D.Tex.1974); and Gilmore & Black, *The Law of Admiralty* at 388 (1957).

The first edition of Gilmore & Black does state unequivocally that "[o]ur courts will assume jurisdiction and will apply our law in any case where . . . the shipowner owes allegiance to the United States." The only authority cited in support of that proposition is *Lauritzen v. Larsen, supra*, 345 U.S. at 587–88, 73 S.Ct. 921. As will be discussed *infra*, I conclude that *Lauritzen* does not support such an inflexible rule. The second edition of Gilmore & Black omits the categorical statements contained in the first edition and, citing the *Rhoditis* case among others, merely concludes that

*Lauritzen v. Larsen, supra*, at 582, 73 S.Ct. at 928 (emphasis supplied). Accordingly, in making its choice of law, the court looked not to the domicile of the parent of the vessel owner or even to the overall business operations of the vessel owner. Rather it was the "base of operations of the vessel" which was seen as relevant. In this case, it is clear from the record that the business enterprise which gave rise to the alleged liability was a Venezuelan based one.

12. 46 U.S.C. § 713 provides in pertinent part:
 In the construction of title 53 of the Revised Statutes, every person having the command of any vessel belonging to any citizen of the United States shall be deemed to be the "master" thereof; and every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a "seaman" . . . . .

Liberian flags of convenience and Panamanian corporations will not prevent courts from looking to the reality of a situation and applying United States law where a United States based enterprise is involved. *See* Gilmore & Black, *The Law of Admiralty* at 477 (2d ed. 1975).

Section 713 of Title 46 is not applicable to the Jones Act. It was enacted as a part of the Seaman's Act of 1872 and applies only to those sections of Title 53 of the Revised Statutes that were contained in that Act. The Jones Act did not become a part of our law until enactment of the Merchant Marine Act of 1920. As the Supreme Court held in *Warner v. Goltra*, 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254 (1934), the codification of Section 713 as a part of Title 46 did not effect an amendment to the Jones Act.

The facts of the cases cited by plaintiffs do not provide strong support for the proposition that United States ownership *alone* should be sufficient. The injured seaman in *Gerradin* was a United States citizen; those in *Carroll* and *Rode* were American domiciliaries. The United States thus had a compelling interest in applying its own law, wholly apart from the allegiance of the vessel owner. In *Ramirez*, the court seemed to conclude that the defendant corporation was estopped from contending that the Jones Act did not apply, since the corporation held itself out as an "American" corporation in its employment contract with the plaintiff. The court also relied on the fact that the corporation did business in the United States, a factor which I have concluded carries little weight under *Lauritzen*.[13]

Thus, I conclude that the crucial question cannot be resolved on the basis of plaintiffs' authorities. Nor have I been able to find any other authority which considers a situation like the instant one.[14] Application of the approach outlined in *Lauritzen, Rhoditis* and *DeMateos*, however, leads me to the conclusion that Congress did not intend our law to be applied in such situations.

 The *Lauritzen* case recognizes that the most commonly accepted basis in international law for selecting tort rules of decision is by reference to the place where the liability arose.[15] This reflects the strong interest of a nation in the activity which goes on within its sovereign territory. The court noted, however, the impracticality of such a rule when applied "to an enterprise conducted under many territorial rules and under none," and observed that the "more constant law of the flag" is ordinarily applied to vessels which ply international waters from port to port. But such pragmatic considerations do not make the interest of a sovereign in activities occurring within its borders any less. Where, as here, the enterprise giving rise to the liability is conducted solely within one jurisdiction, that interest should be given substantial weight, I believe, in making a choice of law decision. When one adds to this factor the fact that the plaintiffs' decedents were Venezuelan nationals whose employment never took them beyond the Venezuelan territory and the fact of the bona fide [16] Venezuelan registration of the vessel, it is apparent that the transaction allegedly giving rise to liability was a Venezuelan one in which Venezuela had the clearly predominant, if not the exclusive, interest.

---

13. *See* p. 927, *supra*, at n. 9.

14. In *Farmer v. Standard Dredging*, 167 F.Supp. 381 (D.Del.1958), this Court was confronted with a situation where the plaintiff was injured on a dredge being operated in the territorial waters of Venezuela. The plaintiff and defendant were United States citizens and the dredge was registered under the laws of the United States. The Jones Act was, accordingly, applied. The opinion suggests, however, that absent the United States registry and the United States citizenship of the plaintiff, Venezuela would have been permitted to limit the liability of employers for torts occurring within

its territorial waters to the "indemnification" provided by Venezuelan law.

15. The court noted the position of the original Restatement of Conflicts of Laws that maritime torts committed within the territorial waters of a nation are governed by its laws, even though torts on the high seas are governed by the law of the flag. *Restatement, Conflicts of Laws* §§ 404, 406.

16. There can be no contention here that Venezuelan registration was one of "mere convenience."

By contrast, if one asks what interest the United States has in applying her rules of decision to these alleged torts, the answer must be little or none. This is not a case, like *Rhoditis*, where a United States based enterprise is competing with other United States based enterprises while seeking to avoid the obligations imposed by United States law. What is involved here is a Venezuelan oil production and refining enterprise and, while the United States undoubtedly has a legitimate interest in some activities of a Delaware corporation doing business in Venezuela, it would not seem to have any significant interest in dictating the legal responsibility of Creole, in its capacity as a Venezuelan employer, to its Venezuelan employees.

Venezuela's approach to compensation for the injury or death of those in the position of plaintiffs' decedents is like that of our workmen's compensation laws. Its law provides for liability without fault of the employer. It further provides that this "indemnification" will be the limit of the employer's responsibility. Given the pervading Venezuelan interest in the activity allegedly giving rise to liability and the extremely limited interest of the United States therein, I am confident that Congress did not intend to override Venezuelan law in a situation of this kind by bestowing an additional cause of action on Venezuelan employees.

These cases will be dismissed without prejudice to any rights plaintiffs may have under any law other than that of the United States.