613 F.2d 1240
 Mrs. Leonor Maria CHIRINOS de ALVAREZ, Individually and as
Personal Representative of the Estate of Telesforo
Alvarez, Deceased, Appellant,
v.
CREOLE PETROLEUM CORPORATION.
Mrs. Ana Maria PENA de VALERO, Individually and as Personal
Representative of the Estate of Rigoberto Valero,
Deceased, Appellant,
v.
CREOLE PETROLEUM CORPORATION.
Mrs. Edita Bartola CHIRINOS de MARIN, Individually and as
Personal Representative of the Estate of Santiago
Marin, Deceased, Appellant,
v.
CREOLE PETROLEUM CORPORATION.
Mrs. Berta Rosa AVILA de FEREIRA, Individually and as
Personal Representative of the Estate of Ramiro
Antonio Fereira, Deceased, Appellant,
v.
CREOLE PETROLEUM CORPORATION.
Mrs. Ana Maria PENA de VALERO, Individually and as Personal
Representative of the Estate of Rigoberto Valero,
Deceased, Appellant,
v.
EXXON CORPORATION.
Mrs. Leonor Maria CHIRINOS de ALVAREZ, Individually and as
Personal Representative of the Estate of Telesforo
Alvarez, Deceased, Appellant,
v.
EXXON CORPORATION.
Mrs. Berta Rosa AVILA de FEREIRA, Individually and as
Personal Representative of the Estate of Ramiro
Antonio Fereira, Deceased, Appellant,
v.
EXXON CORPORATION.
Mrs. Edita Bartola CHIRINOS de MARIN, Individually and as
Personal Representative of the Estate of Santiago
Marin, Deceased, Appellant,
v.
EXXON CORPORATION.
 Nos. 79-1226 to 79-1233.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 15, 1979.
Decided Jan. 28, 1980.
 
 Marvin I. Barish (argued), Michael D. Fishbein, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., John Biggs, III, Biggs & Battaglia, Wilmington, Del., for appellants.
 Peter M. Sieglaff (argued), Potter, Anderson & Corroon, Wilmington, Del., for Creole Petroleum; Daniel J. Dougherty, Mark Muller, Kirlin, Campbell & Keating, New York City, of counsel.
 Allen M. Terrell, Jr. (argued), William J. Wade, Richards, Layton & Finger, Wilmington, Del., for Exxon Corp.; George D. Byrnes, Exxon Corp., New York City, of counsel.
 Before GIBBONS, HIGGINBOTHAM, Circuit Judges, WEINER, District Judge.*
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 In November, 1975 four Venezuelan men died in an explosion while on a crew launch in Lake Maracaibo, Venezuela. Their widows brought suit in the courts of the United States arguing that the laws of the United States the Jones Act, 46 U.S.C. § 688, and general maritime law should be applied to their wrongful death and survival actions. The district court dismissed their complaints, reasoning that United States law did not apply because the only significant link between the accident and the United States was the ownership of the vessels by a United States corporation. The court held that United States ownership was insufficient to trigger the application of United States law, especially since the control of the relevant operations of the corporation was based in Venezuela. We agree and will therefore affirm the dismissal of their complaints.
 
 I.
 
 2
 On November 17, 1975, four male employees of the Creole Petroleum Corporation (Creole) were aboard one of Creole's crew launches near a gas compression/reinjection plant owned and operated by Creole on a fixed platform in Lake Maracaibo, Venezuela. Three of the men were sailors; the fourth was an employee who was constantly aboard Creole's launches. An explosion and fire occurred, resulting in the death of the four men.
 
 
 3
 The crew launches involved in the accident had Venezuelan certificates of registration and special permits entitling them to operate only in the internal waters of Venezuela. The employees and their widows were all residents and citizens of Venezuela. Their employment contracts were written in Venezuela and the accidental deaths of these men are covered by Venezuelan labor law. It is alleged that the explosion was caused by the negligence of Creole, by the unseaworthiness of the vessels and by the failure of Creole to provide proper maintenance and cure.
 
 
 4
 Since the 1920's Creole has been engaged exclusively in the business of crude oil exploration, production and refining in Venezuela. All of its properties are located there and its corporate headquarters are in Caracas, Venezuela. By 1975, it was the largest producer and refiner of crude oil in Venezuela, with approximately 40% Of the total crude oil production in Venezuela. Most of Creole's production is for export, with between 6%-7% Consumed in Venezuela. One third is exported to the United States.
 
 
 5
 At the time of the accident five of Creole's six officers were residents of Venezuela: one was a citizen of Venezuela; four were United States citizens who lived in Caracas. Of Creole's seven directors, six were residents of Venezuela. Three were United States citizens who lived in Caracas and three were Venezuelan citizens. Meetings of Creole's board of directors were held monthly, eight meetings per year were held in Caracas and four in New York City. Creole held its annual shareholders meeting in New York City at the headquarters of the Exxon Corporation (Exxon).
 
 
 6
 Creole was incorporated in Delaware during the 1920's. In 1928, the Standard Oil Company of New Jersey, a predecessor of Exxon, acquired a majority shareholder interest in Creole. By the time of the accident Exxon held 100% Of Creole's stock.
 
 
 7
 While Creole is incorporated in Delaware, at all times relevant to the action, it did no business in Delaware and only maintained a registered agent there for the purpose of service of process. Creole maintained an export sales office in New York. This office handled the processing of most of Creole's contracts for export sales, regardless of the destination of the oil. Nevertheless, major sales decisions were made in Caracas.
 
 
 8
 Creole's principal link with the United States is through Exxon. Over the years Exxon has maintained continuing relations with its affiliate. This relationship included Exxon's acting as a clearinghouse for transactions between Creole, Exxon and other subsidiaries or affiliates; providing an interest bearing demand deposit account for Creole, which Creole used in its transactions with Exxon and its subsidiaries or affiliates; and sharing with Creole and other Exxon subsidiaries or affiliates costs of research and technology programs.
 
 II.
 
 9
 The plaintiffs assert that when the district court granted the defendants' motions to dismiss it erred because it resolved questions of fact against them. They argue that under Rule 12(b)(6), Fed.R.Civ.P.,[1] the defendants' motions must be treated as motions for summary judgment under Rule 56, Fed.R.Civ.P.[2] and as such all factual questions must be resolved in their favor. We agree that all factual disputes should be resolved in favor of the plaintiffs. However, the plaintiffs have not shown us, nor have we been able to find, any instance where the district court made an improper determination which would cause us to reverse its decision.
 
 
 10
 The order dismissing the plaintiffs' complaint was issued in response to motions to dismiss submitted by both Exxon and Creole. The motions urged dismissal on the grounds that the court lacked subject matter jurisdiction, that the court was not the proper forum under the doctrine of Forum non conveniens, and that the plaintiffs had not stated a cause of action upon which relief could be granted.[3]
 
 
 11
 Although the court did not clearly state so, it is apparent from a review of its decision that the dismissal was based primarily on the ground that the plaintiffs had not stated a ground upon which relief could be granted.
 
 
 12
 First, the court's dismissal was not based on jurisdictional grounds. The court held that it had jurisdiction to consider the claim, Chirinos de Alvarez v. Creole Petroleum Corporation, 462 F.Supp. 782, 785 (D.Del.1978), a determination with which we agree. The Supreme Court's comments in Romero v. International Terminal Operating Co., 358 U.S. 354, 359, 79 S.Ct. 468, 473, 3 L.Ed.2d 368 (1959) confirm the correctness of that holding:
 
 
 13
 Petitioner asserts a substantial claim that the Jones Act affords him a right of recovery for the negligence of his employer. Such assertion alone is sufficient to empower the District Court to assume jurisdiction over the case and determine whether, in fact, the Act does provide the claimed rights. "A cause of action under our law was asserted here, and the court had power to determine whether it was or was not well founded in law and in fact." Lauritzen v. Larsen, 345 U.S. 571, 575, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).
 
 
 14
 Second, the district court relied only in part on Forum non conveniens principles. It noted that the plaintiffs did not "seriously contend that the factors by which Forum non conveniens issues are to be determined . . . do not weigh in favor of Venezuela if the governing law is determined to be that of Venezuela." 462 F.Supp. at 785. The plaintiffs have affirmed that position to this court. Reply Brief for Appellants at 11. It stated that therefore "the controlling question is whether the Jones Act and the United States general maritime law" are applicable. Id.
 
 
 15
 Thus, the district court's decision was principally concerned with whether the plaintiffs were entitled to relief under United States law, and as such, it was in the nature of a decision on a motion for summary judgment. Therefore, all factual disputes and inferences are to be resolved favorably for the plaintiffs. Adickes v. S. H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Wright, Law of Federal Courts, P 99 (2d ed. 1970).
 
 
 16
 The plaintiffs argue that the district court made a number of improper inferences. We do not agree. In a motion for summary judgment a court must resolve all factual disputes against the moving party. However, when an issue of fact is supported by affidavits or other evidence which admit of only one conclusion, the court may not draw an opposite conclusion merely on the basis of unsupported allegations. Adickes, 398 U.S. at 160, 90 S.Ct. 1598. In each instance cited by the plaintiffs, either their evidence does not support the conclusion they wished the court to reach or there are critical links missing in the causal chain which they would have had the court construct.
 
 
 17
 For example, the plaintiffs challenge the district court's statement that "(o)ne third of (Creole's) crude oil and petroleum products were sold for export to the United States while the remainder was sold for export to other countries." 462 F.Supp. at 784. As contrary evidence they allude to materials that allegedly establish that "90.2%" of Creole's sales were "made to Exxon or through Exxon affiliated companies with their principal place of business in the United States." Brief for Appellants at 25. However, close scrutiny of the facts alluded to unmasks their argument. First, while their evidence shows that Creole used Exxon management devices to process the sale of much of its oil, it does not show that the oil was to be exported to the United States. Second, it does not show that the "Exxon affiliates" to which sales were made have their "principal place(s) of business in the United States." Indeed, the record shows sales to Exxon affiliates which are based in the United Kingdom and Canada. App., at 1216a. Moreover, the district court's figures are supported by the record. App., at 335a-37a, 1129a-30a.
 
 
 18
 As another example, the plaintiffs challenge the district court's inferences regarding the base of control of Creole's sales, financing and technological decisions. Yet in each instance, they offer no evidence that is sufficient to permit the court to draw their inference. For example, the appellants argue, "Exxon controlled the prices to be charged to purchasers of Creole's petrochemical products." Reply Brief for Appellants at 5. None of the materials they refer us to support this statement. The first, App., at 1228a, merely recounts the volume of Creole's sales to Exxon and its affiliates. The second, App., at 1216a, makes no references to prices paid. The only statement which even vaguely refers to the plaintiffs' assertion is:
 
 
 19
 Exxon International Company enters into sales contracts with specific Customers acceptable to Creole, and If in agreement with the contract terms, Creole assumes the supply function.
 
 
 20
 Id. (emphasis added). This statement by no means supports the plaintiffs' conclusion. The third reference, App., at 1316a-18a, is to an Exxon memo regarding a sale of Creole's products to a Mexican Exxon affiliate. The plaintiffs boldly assert that because the memo states, "The FOB price and freight cost will be advised to you," Id. at 1316a, that the district court should have concluded that Exxon was setting the price. The inferential link between these two ideas is simply too weak.
 
 
 21
 Most importantly, the plaintiffs have failed to show us that the district court made any incorrect factual conclusion that resulted in an improper application of the law to their case. We therefore conclude that the district court properly applied Rule 56.
 
 III.
 A.
 
 22
 The principal issue is whether the Jones Act is to be applied to this Venezuelan accident. The Jones Act textually applies to "any seaman",[4] and it implies that all seamen, everywhere, whatever their nationality, may seek the protection of the United States laws.[5] In Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953),[6] the Supreme Court stated that the statute's reach was not that wide. The Court held that the breadth of the Act's coverage was limited by "international maritime law of impressive maturity and universality. . . . (These laws) aims at stability and order through usages which considerations of comity, reciprocity and long-range interest have developed to define the domain which each nation will claim as its own." Id. at 581-82, 73 S.Ct. at 928.
 
 
 23
 The Lauritzen court suggested that a court deciding the applicability of the Act should "ascertai(n) and valu(e) points of contact between the transaction and the states or governments whose competing laws are involved." Id. at 582, 73 S.Ct. at 928. It enumerated seven factors that were to be considered: the place of the wrongful act; the law of the flag; the allegiance of the domicile of the injured; the allegiance of the defendant shipowner; the place of contract; the inaccessibility of the foreign forum; and the law of the forum.
 
 
 24
 The reach of the Act was discussed further by the Court in Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970).[7] The Court emphasized that the seven factors in Lauritzen were "not a mechanical" test and that the applicability or importance of any of the factors should be "considered in light of the national interest served by the assertion of Jones Act jurisdiction." Id. at 308, 90 S.Ct. at 1734. The Court cited approvingly the following language from Bartholomew v. Universe Tankships, Inc., 263 F.2d 437, 441 (2d Cir. 1959):
 
 
 25
 (T)he decisional process of arriving at a conclusion on the subject of the application of the Jones Act involves the ascertainment of the facts or groups of facts which constitute contacts between the transaction involved in the case and the United States, and then deciding whether or not they are substantial. Thus, each factor is to be "weighed" and "evaluated" only to the end that, after each factor has been given consideration, a rational and satisfactory conclusion may be arrived at on the question of whether all the factors present add up to the necessary substantiality.
 
 
 26
 398 U.S. at 309 n. 4, 90 S.Ct. at 1734. In Hellenic Lines the Court added the employer's "base of operations" to the seven Lauritzen factors.
 
 
 27
 The principles established by Lauritzen and Hellenic Lines were applied by this court in DeMateos v. Texaco, Inc., 562 F.2d 895 (3d Cir. 1977). There we held that the Jones Act did not cover an injured seaman when the only factor linking the United States to the accident was the ownership of stock of a parent company by United States citizens.[8]
 
 
 28
 Taken together these cases hold that a court reviewing a claim to Jones Act coverage should determine the substantiality of the links to the United States and the links to the foreign sovereignty. This process is undertaken in order to discern in whose "domain" the paramount interest lies. Lauritzen, 345 U.S. at 582, 73 S.Ct. 921. Under certain circumstances the Jones Act may be far-reaching. However, when the links to the United States are weak and the interests of another sovereign are substantial, the Jones Act is not applicable.
 
 
 29
 The plaintiffs argue that our decision is controlled by 46 U.S.C. § 713, which provides in pertinent part:
 
 
 30
 In the construction of title 53 of the Revised Statutes, every person having the command of any vessel belonging to any citizen of the United States shall be deemed to be the "master" thereof; and every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a "seaman."We do not agree. As the district court noted:
 
 
 31
 Section 713 of Title 46 is not applicable to the Jones Act. It was enacted as part of the Seamans Act of 1872 and applies only to those sections of Title 53 of the Revised Statutes that were contained in that Act. The Jones Act did not became a part of our law until enactment of the Merchant Marine Act of 1920. As the Supreme Court held in Warner v. Goltra, 293 U.S. 155, 55 S.Ct. 46, 79 L.Ed. 254 (1934), the codification of Section 713 as a part of Title 46 did not effect an amendment of the Jones Act.
 
 
 32
 462 F.Supp. at 787.
 
 B.
 
 33
 Our review of the facts of this case persuades us that the Jones Act is not applicable to the plaintiffs' claims. Of the eight factors enumerated in Lauritzen and Hellenic Lines only two, the allegiance of the shipowner and the law of the forum, support the application of United States law. The accident occurred in Venezuela; the ship was registered and sailed under Venezuelan flag; the crewmen were all residents and citizens of Venezuela; the contract was made in Venezuela; and the Venezuelan courts are available to the parties. While Creole did engage in some business in the United States and was affiliated with Exxon, these activities are not substantial enough for us to consider Creole's "base of operations" to be in the United States. Creole's base was in Caracas, Venezuela. Only the law of the forum, a factor Lauritzen considered to be generally unimportant, 345 U.S. at 590-91, 73 S.Ct. 921, and the allegiance of the shipowner favor the plaintiffs.
 
 
 34
 Most importantly, the Venezuelan concerns are considerable; the United States interests pale in comparison. The accident was almost entirely an internal Venezuelan event. Lake Maracaibo is an inland body of water twenty-two miles from the coast and it is connected to the Gulf of Venezuela by a man-made channel. The boats involved in the accident never left these internal waters. The "decedents were Venezuelan nationals whose employment never took them beyond the Venezuelan territory." 462 F.Supp. at 787. And Creole operated its crude oil production wholly within the borders of Venezuela.
 
 
 35
 This court's comments in DeMateos are applicable here.
 
 
 36
 It would be an extreme suggestion, we think, that American law could govern relations between (Creole), and the employees in its (Venezuelan) gasoline stations because its stock was owned by a multinational business enterprise incorporated in Delaware. It is no less extreme to suggest that American law should govern the relations between (Creole) and its employees on vessels it uses in (Lake Maracaibo).
 
 
 37
 562 F.2d at 902.
 
 
 38
 In this case, ownership of the vessel does not, as the plaintiffs argue, provide the substantiality of contacts which would make this factor controlling. The plaintiffs have introduced a considerable number of materials which show a close relationship between Exxon and Creole. For example, Creole and Exxon share research and development programs and Creole utilizes some of Exxon's management procedures in its accounting and sales divisions. However, these materials do not show that the events which are important to this accident took place outside of Venezuela.
 
 
 39
 Finally, the plaintiffs suggest that our decision should be influenced by the compensation available in Venezuela which they consider to be limited. We do not agree. The principles that we articulate in this case will be applied to a broad range of accidents, regardless of the plentifulness of the compensation provided by the other sovereignty. The plaintiffs' claim must depend on the substantiality of the Venezuelan interest and not on the substantiality of the recovery available under Venezuelan law. Further, as we stated in DeMateos,
 
 
 40
 (this argument) is a variety of social jingoism, which presumes that the "liberal purposes" of American law must be exported to wherever our multinational corporations are permitted to do business. Some of our laws, to other nations, may not appear as liberal as the Jones Act appears to us, and extreme applications of such an effort might well result in those nations closing their door to such corporations, to their and our competitive disadvantage.
 
 
 41
 Id.
 
 C.
 
 42
 The test of substantiality we have articulated above is the same when we consider the general United States maritime law claim. There too, the substantiality of Venezuela's interest takes precedence and United States law is not applicable.
 
 IV.
 
 43
 We conclude that the law of the United States is not the appropriate law to apply to these actions. We will therefore affirm the dismissal of the district court.[9]
 
 
 44
 Each party will bear its own costs.
 
 
 
 *
 The Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Fed.R.Civ.P. 12(b) provides:
 (b) How Presented. Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join a party under Rule 19. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, he may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
 
 
 [2]
 Fed.R.Civ.P. 56 provides in part:
 (b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.
 (e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.
 
 
 [3]
 Exxon asserted additionally that it was not a proper party to the action
 
 
 [4]
 The Act provides:
 Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
 46 U.S.C. § 688.
 
 
 [5]
 For the purposes of this appeal, the parties have assumed that the Jones Act is applicable except as to its extra-national effect. We therefore have not considered whether the crewmen are "seamen" within the meaning of the Act
 
 
 [6]
 In Lauritzen the plaintiff, "a Danish seaman, while temporarily in New York joined . . . a ship of Danish flag . . . owned by . . . a Danish citizen. . . . (He) was negligently injured . . . while in (an) Havana harbor." 345 U.S. at 573, 73 S.Ct. at 923
 
 
 [7]
 In Hellenic Lines, the plaintiff was a Greek citizen who, while in Greece, signed on as a seaman on a ship owned by a Greek corporation. His contract of employment provided that Greek law and a Greek collective-bargaining agreement applied to claims arising out of his employment. Rhoditis, the plaintiff, was injured while on board the ship in the Port of New Orleans. The record showed that the Greek corporation Hellenic Lines, was owned by a United States domiciliary, a lawful permanent United States resident alien, who was a Greek citizen. Hellenic Lines' largest offices were in New York, and another was in New Orleans. The corporation's owner lived in Connecticut and managed the corporation out of New York. The record also showed that "its entire income is from cargo either originating or terminating in the United States." 398 U.S. at 308, 90 S.Ct. at 1733
 
 
 [8]
 In DeMateos A Panamanian seaman while in Panama signed on to a ship of Liberian registry, owned by a Panamanian corporation. He was injured on a voyage between Honduras and Costa Rica. The facts showed that the ship was managed by TOT, a British corporation; that TOT was owned by Texaco Ltd., a British corporation; and that Texaco Ltd. was owned by TOEL, a Delaware corporation
 
 
 [9]
 Exxon argues that it is not a proper party to this action, under Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949). Because we have dismissed the actions on other grounds, we will not reach this issue