Maurilo Cardoso DOS SANTOS

v.

READING & BATES DRILLING CO.
et al.

Civ. A. No. 79–29.

United States District Court,
E. D. Louisiana.

Aug. 28, 1980.

Marvin I. Barish, Philadelphia, Pa., Anthony Dingleman, New Orleans, La., for plaintiff.

Joel Borrello, New Orleans, La., for defendants.

SEAR, District Judge.

Plaintiff, Maurilo Cardoso dos Santos, a Brazilian citizen and resident, has brought suit against Reading & Bates Drilling Co., Reading & Bates Offshore Drilling Co. (now "Reading & Bates Corp.") and Reading & Bates Perfuracoes, Ltd. (hereinafter "Demaga") under the Jones Act and General Maritime Law for injuries which he sustained while working aboard a drilling barge known as the C.E. THORNTON off the coast of Brazil.[1] He alleges that the defendants owned and operated the C.E. THORNTON and that due to their negligence and the vessel's unseaworthiness he injured his left hand. In addition to a claim for damages, plaintiff also asserts a claim for maintenance and cure.

The defendants move to dismiss and/or for summary judgment on the authority of

1. Initially plaintiff also joined as a defendant Petroleo Brasileiro, S.A.—Petrobras, but he later dismissed Petrobras voluntarily.

the Supreme Court's decisions in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). They contend that the United States does not have a sufficient interest in the transaction allegedly giving rise to liability to justify the application of American rules of decision. The plaintiff agrees that he must demonstrate that the United States does have a substantial interest in his accident and its aftermath, but he contends that this interest is shown by the substantial control allegedly exercised over Demaga, a Brazilian corporation, by the other two defendants, both of which are American corporations.

■ In *Lauritzen, supra,* the Supreme Court held that despite the broad language of the Jones Act, 46 U.S.C. § 688,[2] which literally extends to "Any seaman who shall suffer personal injury in the course of his employment," the act should be applied only where it appears that the contacts between the shipping transaction regulated and the United States are such that the national interest would be served by the assertion of authority. 345 U.S. at 582, 73 S.Ct. at 928. Justice Jackson listed seven factors which should be considered in determining whether the necessary contacts exist in any particular case. They include

1. Place of the wrongful act;
2. Law of the flag;
3. Allegiance or domicile of the injured party;
4. Allegiance of the defendant shipowner;
5. Place of contract;
6. Inaccessibility of a foreign forum;
7. Law of the forum.

2. The Jones Act provides,
   Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representa-

Subsequently, in *Rhoditis, supra,* the Court added to these seven factors the "base of operations of the shipowner." In that case the Court also noted that the *Lauritzen* test was not a mechanical one and that the list of factors in that case was not exhaustive. Rather, the significance of any factors which may be present must be considered in light of the national interest which would be served by the assertion of the Jones Act. 398 U.S. at 308–09, 90 S.Ct. at 1733–34. A court faced with a Jones Act jurisdiction problem must examine the "real nature of the operation and [take] a cold objective look at the actual operational contacts that this ship and this owner have with the United States." *Id.* at 310, 90 S.Ct. at 1734.

The test formulated in *Lauritzen* and *Rhoditis* regarding the application of the Jones Act also applies when a party seeks to have the court apply American General Maritime Law. *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 381–84, 79 S.Ct. 468, 485–86, 3 L.Ed.2d 368 (1959). Therefore, while in the following discussion I may occasionally refer only to the Jones Act, the analysis is equally applicable to the unseaworthiness and maintenance and cure claims which plaintiff has asserted.

■ The plaintiff is a lifelong resident and citizen of Brazil. At the time of his injury he was employed by Demaga, which was engaged in drilling activities off the coast of Brazil pursuant to a five-year drilling contract executed and in effect between Demaga and the Brazilian oil monopoly, Petrobras. The plaintiff executed his employment contract in Brazil, and the rig upon which he worked, the C.E. THORNTON, never took him beyond the coastal waters of Brazil.

tive of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located. ›

Demaga was incorporated under the laws of Brazil on December 16, 1971 for the primary purpose of operating the C.E. THORNTON pursuant to the contract with Petrobras. Reading & Bates Drilling Co. and Reading & Bates Corp. own all of the stock of Demaga, and Reading & Bates Corp. in turn owns all of the stock of Reading & Bates Drilling Co. Demaga has offices in Belem, Vitoria and Rio de Janeiro, while neither of the other two defendants has an office in Brazil. Demaga's sole function is to provide drilling services of the C.E. THORNTON, and the corporation is not licensed to do nor is it doing any business anywhere in the United States. The C.E. THORNTON is operated by Demaga under a bareboat charter from Panama Offshore, Inc., which is a wholly owned subsidiary of Reading & Bates Corp.

Plaintiff admits that none of the *Lauritzen* criteria is satisfied in this case. However, it argues that the two United States-based Reading & Bates defendants exercise substantial management and control over Demaga and that this demonstrates that the "base of operations" of the shipowner is actually in the United States rather than in Brazil. Defendants respond that the parent corporations exercise no more control over Demaga than would any parent corporation and that while they do exercise some supervisory powers due to their pecuniary interest in Demaga's performance, they do not dominate that company's day-to-day operations.

The Fifth Circuit has yet to address the problem of the effect of United States-based stock ownership on the applicability of the Jones Act to foreign operations of foreign corporations. Both the Second and Third Circuits have done so, and while it may be possible to reconcile the results of the cases they have decided, there is a sharp difference in the tone of the opinions, with the Second Circuit leaning far more strongly toward application of the Jones Act in any situation in which the majority of a foreign corporation's stock is owned by American citizens or corporations.

The seminal Second Circuit case is *Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437 (2nd Cir. 1959). In *Bartholomew* the plaintiff, who resided in Brooklyn, sued the defendant under the Jones Act for an accident which occurred in United States territorial waters during a voyage from Baltimore to Philadelphia. The defendant corporation was Liberian, but all of its stock was owned by a Panamanian corporation. All of that company's stock was in turn owned by American citizens, all of its officers were Americans and its principal place of business was New York City. Even under a restrictive reading of *Lauritzen*, it would have been possible for the Second Circuit to hold that the Jones Act was applicable, for there were substantial contacts between the defendant and the United States. However, in so holding the court used some quite expansive language.

Although appellant contends otherwise, the practice in this type of case of looking through the facade of foreign registration and incorporation to the American ownership behind it is now well established . . . This is essential unless the purposes of the Jones Act are to be frustrated by American shipowners intent upon evading their obligations under the law by the simple expedient of incorporating in a foreign country and registering their vessels under a foreign flag . . . What we now do is not to disregard the corporation entity to impose liability on the stockholders, but rather to consider a foreign corporation as if it were an American corporation pursuant to the liberal policies of a regulatory act. 263 F.2d at 442.

Two subsequent opinions from the Second Circuit have applied this expansive formulation. In *Moncada v. Lemuria Shipping Corp.*, 491 F.2d 470 (2nd Cir. 1974), a Honduran seaman's widow sued under the Jones Act for negligence which allegedly led to her husband's death. The court found that the following contacts sufficed to justify application of the Jones Act:

1. All stock of the shipowner was held by Americans. The court noted that this was the "most important" factor.

2. The shipowner and its managing agent and chartering broker all had their base of operations in the United States.

3. All officers of the defendants were American.

4. About 40% of the vessel's voyages began or ended in American ports.

*Moncada* thus strongly suggested that American stock ownership of a foreign corporation by itself would justify application of the Jones Act.

The final Second Circuit decision in this area is *Antypas v. Cia. Maritima San Basilio, S.A.*, 541 F.2d 307 (2nd Cir. 1976). In this case plaintiff was injured on a Greek flag vessel owned by a Panamanian corporation while the ship was on a voyage between Hamburg and ports in the Far East. The ship's agent was based in New York. The vessel operated alternately on two liner services, one from America to Europe and the other from America to the Far East. All stock of the shipowner was in the hands of United States citizens. The court held that these contacts were substantial enough to withstand the defendants' motion for summary judgment. It noted that the allegiance of the stockholders might have been sufficient by itself but that the presence of the agent in New York was an additional factor supporting the application of the Jones Act.

The Third Circuit has taken a more restrictive approach to the application of *Lauritzen* and *Rhoditis*. The seminal case in that circuit is *DeMateos v. Texaco, Inc.*, 562 F.2d 895 (3rd Cir. 1977). Plaintiff, the administratrix of a Panamanian seaman's estate brought suit against Texaco, Inc. and Texaco Panama, Inc. (Texpan) under the Jones Act, the General Maritime Law and the Death on the High Seas Act for the seaman's death. At the time of his death he was a seaman aboard the S.S. TEXACO KENYA, owned by Texpan, on a voyage between Honduras and Costa Rica. The TEXACO KENYA was registered in Liberia, and Texpan, its owner, was a Panamanian corporation with its principal place of business in Panama City. In addition to operating vessels, it also marketed petroleum products in Panama. The decedent executed his employment contract in Panama, and all of the voyages which the vessel had made were short runs in the Caribbean. In particular, it had never entered the territorial waters of the United States. Although Texpan owned the vessel, it was managed by Texaco Overseas Tankship Ltd. (TOT) a United Kingdom corporation with its principal place of business in London. TOT was a wholly owned subsidiary of Texas Operations (Europe) Ltd. (TOEL), and Texaco, Inc., a Delaware corporation, owned all of the stock of both Texpan and TOEL.

The plaintiff had first filed suit in Panama, where recovery was eventually denied. While the matter in Panama was pending, suit was filed in the Eastern District of Pennsylvania, which dismissed the suit due to the inapplicability of American law to the transaction sued upon. The Third Circuit affirmed the dismissal.

It found that the TEXACO KENYA was employed in transportation of petroleum between foreign nations and that there was no evidence that it had ever earned income from voyages to the United States. The vessel's base of operations was either London or Panama. Moreover, none of the other factors listed in *Lauritzen* and *Rhoditis* militated in favor of the applicability of the Jones Act. Plaintiffs argued that Texaco's ownership of TOEL and Texpan was nonetheless a substantial contact between the accident sued upon and the United States. The Court roundly rejected that argument.

The District Court's findings of fact, which are not disputed, disclose that both Texpan and TOT are separate and solvent legal entities, with separate boards of directors, maintaining separate books of account. Texpan, in particular, has an extensive business in Panama in the sale of petroleum products both retail and wholesale. It would be an extreme suggestion, we think, that American law could govern relations between Texpan and the employees in its Panamanian gasoline stations because its stock was owned by a multinational business enterprise in-

corporated in Delaware. It is no less extreme to suggest that American law should govern the relations between Texpan and its employees on vessels it uses in the transportation of petroleum between Central American countries. Either suggestion is a variety of social jingoism, which presumes that the "liberal purposes" of American law must be exported to wherever our multinational corporations are permitted to do business.

562 F.2d at 902. The court specifically noted its disapproval of the line of Second Circuit cases, including those discussed *supra*, which indicate that American stock ownership in the shipowning corporation is sufficient to justify the extraterritorial application of the Jones Act. *Id.* at 902, n.3.

In the recent decision of *Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240 (3rd Cir. 1980), the Third Circuit reaffirmed the position taken in *DeMateos*. Four employees, all citizens and domiciliaries of Venezuela, were killed in an explosion while working for Creole Petroleum Corp. on a crew launch in Lake Maracaibo, Venezuela. The launch was registered in Venezuela, and the employment contracts were entered into in Venezuela. Creole is a Delaware corporation, 100% of whose stock is owned by Exxon, and while it did no business in Delaware, it did maintain a sales office in New York. Its major link with the United States was through Exxon. Exxon had acted as a clearinghouse for transactions between Creole and Exxon or its subsidiaries and affiliates. Exxon also provided an interest bearing demand deposit account for Creole, which Creole used in its transactions with Exxon and its subsidiaries and affiliates. Finally, Exxon shared with Creole the costs of research and technology programs. Thus, there was a substantial continuing relationship between Exxon and Creole.

Nonetheless, the Third Circuit held that neither the Jones Act nor American General Maritime Law were applicable. It noted that the United States interest in the transaction which formed the subject of the lawsuit was inconsiderable. The accident occurred on an inland body of water aboard vessels which never left the internal waters of a foreign country. The decedents were Venezuelan nationals whose employment never took them outside Venezuela. Creole's oil production operation was contained entirely within Venezuela. Under those circumstances, the court concluded that even though there appeared to be a close working relationship between Exxon and Creole, that by itself did not warrant application of the Jones Act.

The Second Circuit, while its opinions have recited the requirement of *Lauritzen* that there be some significant connection between the shipping transaction being regulated and the national interest of the United States before the Jones Act may properly be applied, has in its more recent pronouncements applied a standard which closely resembles the "minimum contacts" standard applied in personal jurisdiction problems. So long as there is some contact between the defendant shipowner and the United States so that application of the Jones Act does not seem unfair, the Second Circuit appears willing to apply it. The Third Circuit, on the other hand, has followed the reasoning of *Lauritzen* much more closely. It has been unwilling to extend American law to transactions involving foreign seamen in foreign waters unless there are substantial contacts, not merely minimal contacts, between the United States and the transaction. *Lauritzen* emphasized,

> [T]he virtue and utility of sea-borne commerce lies in its frequent and important contacts with more than one country. If, to serve some immediate interest, the courts of each were to exploit every such contact to the limit of its power, it is not difficult to see that a multiplicity of conflicting and overlapping burdens would blight international carriage by sea.

345 U.S. at 581, 73 S.Ct. at 928. The Third Circuit has heeded this language, while the Second Circuit, in its attempts to apply the liberal purposes of the Jones Act, has sometimes appeared driven by the social jingoism decried in *DeMateos*.

While the Fifth Circuit has yet to speak directly on this subject, it has indicated by a recent affirmance without opinion of a decision by Judge Adrian Duplantier of this district that it supports the Third Circuit's position. In that case, *Martyn v. Transworld Drilling Co., Ltd.*, C.A. 78–3423 (E.D. La., November 20, 1979), *aff'd* 619 F.2d 82 (5th Cir. 1980), the plaintiff was injured in the North Sea on a movable oil drilling platform. The owner of the rig was a Bahamian corporation, although both that corporation and plaintiff's employer were subsidiaries of Kerr-McGee Corporation, an American corporation. This was the only connection between plaintiff's claim and the United States; Judge Duplantier, relying on *DeMateos*, held it to be insufficient to warrant application of the Jones Act. The Fifth Circuit affirmed Judge Duplantier's dismissal of the case on May 28, 1980 without opinion.

The affirmance in *Martyn* is some indication that the Fifth Circuit is prepared to align itself with the Third Circuit's holdings in *DeMateos* and *Chirinos de Alvarez*. Moreover, the Third Circuit's holdings are both more reasonable and more in line with the decision in *Lauritzen* than are the Second Circuit's. I have therefore determined that I should apply the principles of *DeMateos* and *Chirinos de Alvarez* to the facts presented in this case.

The only connection between plaintiff's accident and the United States is the relationship between Demaga and the two United States-based companies which own all of the Demaga's stock. While the record does show that the United States companies exercise some supervisory and general administrative responsibility for Demaga, that relationship is not sufficient to warrant application of the Jones Act to this case.

Reading & Bates Drilling Co. provides Demaga with procedure manuals, which help standardize the reports and information received from Demaga.[3] Reading & Bates Corp. receives copies of Demaga's financial statements and keeps track of Demaga's assets and liabilities.[4] The budget for the C.E. THORNTON was prepared by Demaga but had to be submitted for final approval to the Operations Manager for Reading & Bates Drilling Co.[5] The final decision on the location of the C.E. THORNTON was made by officials of Reading & Bates Drilling.[6]

The contract between Petrobras and Demaga dated August 25, 1972 included Reading & Bates Corp. (then Reading & Bates Offshore Drilling Co.) as a coparty. This development is not surprising in view of the fact that Demaga had only recently been incorporated and does not by itself indicate a lack of corporate separateness. Plaintiff also notes than an official of Reading & Bates Corporation reviewed the job performance of the "President-Director" of Demaga, a fact which again is not surprising since that company, in combination with Reading & Bates Drilling Co., owned all of the stock of Demaga and therefore had a keen interest in the job performance of Demaga's chief executive officer.[7]

The numerous depositions cited by plaintiff fail to demonstrate that Reading & Bates Drilling Co. and Reading & Bates Corp. acted in such a way as to negate the separate existence of Demaga. Those corporations merely took a normal interest in the performance of a company in which they were the sole shareholders. Demaga keeps its own corporate records in Brazil, and duplicate copies of these records are not kept by either parent.[8] It maintains offices in Brazil and employs about 100 persons at those offices.[9] There have been no intercompany loans to Demaga save during that company's formation stages, and those

---

3. Deposition of M.A. Overall at 46–47.

4. *Id.* at 17–18.

5. Deposition of William Ray Baldwin at 76–77.

6. Deposition of R.M. Fellers at 28–30.

7. *Id.* at 17.

8. Deposition of C.E. Thornton at 27 and Deposition of M.A. Overall at 17.

9. Affidavit of Kurt C. Soester.

loans have been fully documented.[10] Demaga maintains its finances separately from those of its parents and has in fact about $1.5 million in retained earnings.[11]

The situation here is indistinguishable from that in *Chirinos de Alvarez, supra.* The only connection between plaintiff's injury and the United States is the fact that two American companies own all of the stock of plaintiff's employer and exercise some general supervisory control over that company. The accident which forms the subject matter of this suit occurred on a drilling barge which has never ventured from the waters off the coast of Brazil, and the plaintiff is a life-long resident of Brazil. The contacts with the United States are no more than ephemeral, and the only country with any real interest in this matter is Brazil. Accordingly,

IT IS ORDERED that defendants' Motion to Dismiss and/or for Summary Judgment is treated as a Motion for Summary Judgment and is GRANTED.

---

**10.** Deposition of M.A. Overall at 9.   **11.** *Id.* at 68–69 and 88–89.