Ernesto C. CRUZ, Victorino A. Domingo, Zaldy N. Bantilan, Leonardo J. Espiritu, Wilfredo D. Jequinto, Juan S. Terencio, Severiano A. Gasataya, Jr., Roberto A. Alejado, Vicente B. Solano, Cesar B. Del Rosario, Renato M. Santiago, Erlito R. Vistar, Richard B. Celoso, Cirilo R. Pacheco, Antonio T. Tanio–An, Armando C. Erediano, Pascualito R. Amistoso and Romeo D. Bardalo, Plaintiffs,

v.

CHESAPEAKE SHIPPING INC., Gleneagle Ship Management Co., Inc., Kuwait Oil Tanker Company, Kuwait Petroleum Corporation, KPC (U.S. Holdings) Inc., Santa Fe International Corp., Defendants.

Civ. A. No. 89–366–JLL.

United States District Court,
D. Delaware.

May 17, 1990.

Richard K. Herrmann of Bayard, Handelman & Murdoch, P.A., Wilmington, Del., Stephen M. Koslow and Wilma Liebman of Quasha, Wessely & Schneider, Washington, D.C., of counsel, for plaintiffs.

Michael B. McCauley of Palmer, Biezup & Henderson, Wilmington, Del., Michael M. Johnson of McCutchen, Black, Verleger & Shea, Los Angeles, Cal., of counsel, for defendant Kuwait Petroleum Corp.

Craig B. Smith of Lassen, Smith, Katzenstein & Furlow, Wilmington, Del., Eugene P. Miller and T.S.L. Perlman of Fort & Schlefer, Washington, D.C., of counsel, for defendant Kuwait Oil Tanker Co., S.A.K.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

## I. BACKGROUND

This matter is a Fair Labor Standards Act suit that arises out of a unique set of circumstances. During the Iran–Iraq war, the United States government permitted eleven Kuwaiti oil and liquefied gas tankers to be re-flagged with the American flag in order to gain the protection of American naval forces in the Persian Gulf. At the time of the re-flagging the ships were entirely crewed by Filipino seamen. These seamen now claim that they are entitled to the American minimum wage because they were working on American flagged vessels.

### A. The Iran–Iraq War

The factual background for this case begins in 1980 when war broke out between Iran and Iraq. *See Kuwaiti Tankers: Hearings Before the House of Representa-*

*tives Committee on Merchant Marine and Fisheries*, 100th Cong., 1st Sess. 37 (1987) (hereinafter *Kuwaiti Tankers*).[1] By the end of 1982, Iran had closed down all Iraqi ports. In response, Iraq developed overland routes, including pipelines, to export oil. Iran countered by attacking the nonbelligerent shipping of moderate Gulf states supporting Iraq. *See id.* at 161–62.[2] After engaging in sabotage within territorial Kuwait, Iran singled out Kuwaiti tankers for attack to prevent any further assistance to Iraq. *See id.* at 38, 163. The tanker war so escalated in 1986 and 1987 that Kuwait turned first to the Soviet Union and then to the United States for assistance. *See id.* at 37–38, 54. Kuwait sought to either charter foreign ships, or to re-flag their own vessels, in order to gain the protection of foreign naval forces.

The USSR responded to Kuwait's overture quickly, indicating they would permit Kuwait to either charter, re-flag, or both. *See id.* at 43. In December of 1986, Kuwait approached the United States Coast Guard. *See id.* at 76. The Coast Guard was told that Kuwait preferred to deal with the United States, but that the Soviet Union had already been contacted and was willing to permit either chartering or re-flagging. *See id.* at 38–39. Kuwait's initial proposal to the United States was to re-flag six oil tankers with the American flag and five tankers with the flag of the USSR. The Kuwait Oil Tanker Company ("KOTC") owned all eleven of these oil tankers.

In "very high-level discussions," the United States convinced Kuwait that it would be best if all eleven ships were American flagged because it would be

> against their interest and the interests of other countries in the area as well as the Western interests to give the Soviet Union a major role in protecting oil destined for the West and to allow the Soviet

Union to make a strategic foothold in this particular part of the world.

*Id.* at 39. Kuwait agreed to re-flag the eleven tankers with the American flag, and decided to charter three Soviet tankers on a short term basis. The United States was assured that the USSR would not have access to port facilities in the Persian Gulf. *See id.* In short, the United States permitted these tankers to be registered and documented under United States law, and to sail under the American flag with United States Naval escort.

## B. Conditions of Re-flagging

Under American law, the re-flagging had to be conditioned on the transferral of title to these ships to a United States corporation. *See* 46 U.S.C. § 12102 (requiring, in pertinent part, American flagged vessels to be owned by a United States corporation whose Chief Executive Officer and Chairman of the Board of Directors are American citizens, and requiring that a majority of the voting power be vested in American citizens); *see also Kuwaiti Tankers* at 77. Chesapeake Shipping Inc. ("Chesapeake"), a Delaware corporation, was incorporated on May 15, 1987, for this purpose, *see Kuwaiti Tankers* at 104, and is in compliance with the control requirements. *See id.* at 41.

Vessels flying the American flag must also comply with United States shipping and manning regulations. In the Kuwaiti oil tanker situation, the Coast Guard performed an overseas safety inspection of the ships to ensure: that they were suitable for their intended purpose; that they were equipped with proper lifesaving, fire prevention, and fire-fighting equipment; that they had suitable accommodations for the crews; that they could operate with safety

---

**1.** Parties on both sides of this action cited to these hearings as support for their arguments. *See, e.g.,* Docket Item ("D.I.") 79 at 8 n. 5; D.I. 105 at 26–27. The Court will, therefore, rely on testimony given before the House Committee as authoritative.

For a discussion of the events leading up to the Iran/Iraq conflict, *see* Comment, The Iran–

Iraq War: United States Resolution of Armed Conflict, 35 Vill.L.Rev. 197, 197–204 (1990) (hereinafter The Iran–Iraq War).

**2.** These moderate nations had provided thirty five billion dollars worth of arms to Iraq since the beginning of the war. *See* The Iran–Iraq War, *supra* note 1, at 218.

to life and property; and that they complied with safety laws and regulations. *See id.* at 77. The Coast Guard found that the vessels conformed to international standards, but fell short of more stringent American regulations. *See id.* at 78.

The United States facilitated re-flagging by waiving certain inspection requirements for a period of one year, and drydocking requirements for a period of two years. *See id.* at 41, 78, 146–48. The Coast Guard also granted a waiver of crew citizenship requirements, except for the positions of ship's master and radio officer, that permitted the Filipino crews to continue manning the vessels. *See* 46 U.S.C. § 8103(e) (requiring a ship's master and radio officer to be United States citizens at all times) *and* 46 U.S.C. § 8103(b) (requiring 75% of the unlicensed crew to be American citizens);[3] *see also* D.I. 105B at 159 (letter from Stafford (of KOTC)[4] to Santa Fe reporting compliance with FCC regulations and requesting initiation of procedures for the FCC to issue a revised radio license). The United States conditioned the waivers on the ships maintaining their current trading patterns, i.e., not calling at United States ports or operating in American trade, and on Chesapeake retaining ownership. *See Kuwaiti Tankers* at 83, 87–88. These conditions were imposed to avoid "skew[ing]" or "having an adverse impact on the marketplace." *Id.* at 87–88.

There is no evidence that these conditions were violated. During the relevant time period, not one of the eleven tankers delivered products directly to the United States or ever called at a United States port. *See* D.I. 105C, Ex. H at 5; Ex. I at 4; Ex. J at 4. Further, KOTC states that only once did a tanker ship oil to two companies in Europe for later delivery to the United States. *See* D.I. 105C, Ex. H at 5. The Plaintiffs have not controverted these assertions on the record.

### C. The Defendants

The named Defendants in the case are: Chesapeake; Gleneagle Ship Management Company, Inc. ("Gleneagle"), a Delaware corporation; KOTC, a Kuwaiti corporation; Kuwait Petroleum Corporation ("KPC"), a Kuwaiti corporation; KPC (U.S. Holdings), Inc.;[5] Santa Fe International Corporation ("Santa Fe"), a Delaware corporation; and Naess Shipping B.V. of Amsterdam ("Naess").[6] KPC is wholly owned by the State of Kuwait. *See* D.I. 86 at ¶ 2.

As noted above, the title of the eleven tankers was transferred from KOTC to Chesapeake. Chesapeake then immediately time-chartered them back to KOTC. KOTC, in turn, time-chartered at least one of the tankers to KPC. *See* D.I. 105B at 146.[7] Chesapeake is a wholly owned subsidiary of KOTC.[8] Each of Chesapeake's officers and directors is also an employee of at least one other member of the KPC corporate group. *Compare* D.I. 105C at Ex. I, attachment 1 (Officers and Directors of Chesapeake) *with* D.I. 105B at 262 (Officers and Directors of Santa Fe) *and* D.I. 105C, Ex. G, attachment D1 & D2 (KOTC

---

3. The waiver of the unlicensed citizenship requirement was upheld in *National Marine Engineers' Beneficial Association v. Burnely*, 684 F.Supp. 6 (D.D.C.1988). A recent amendment to Section 8103 prohibits such waivers unless "qualified seamen who are citizens of the United States are not available," Commercial Fishing Anti–Reflagging Act of 1987, Pub.L. No. 100–239, § 5(a)(2), 101 Stat. 1778, 1780 (1988), *codified at* 46 U.S.C. § 8103(b)(3)(C). That amendment makes this a case of first, and probably last, impression.

4. Stafford was both KOTC's Chartering Manager, *see* D.I. 105B at 159, and Chesapeake's Senior

Vice President and Chief Operating Officer. *See* D.I. 105C, Ex. I at attachment 1.

5. KPC (U.S. Holdings) was dismissed without prejudice on December 18, 1989. *See* D.I. 63.

6. Plaintiffs dropped Naess Shipping as a defendant in their Third Amended Complaint. *See* D.I. 42 at 2.

7. The following is an organizational chart of the original defendant corporations.

[Organizational chart and footnote 8 appear on page 813.]

organizational chart).[9] Not one officer or director is on Chesapeake's payroll. *See, e.g.,* D.I. 105B at 395, 432–33, 441; *see also* D.I. 105A at Ex. A, p. 11–12 (Chesapeake's Vice President and Assistant Secretary is paid by Santa Fe and has never received compensation directly from Chesapeake); *see also supra* note 4 (discussing the roles of Stafford). Chesapeake has no facilities in either the United States or Kuwait.

Although the vessels were time-chartered, Chesapeake, as owner of the tankers, retained primary responsibility for their manning and operation. *See* D.I. 105A, Ex. B at 37 (explaining the effect of time chartering a vessel); *see also* C. Davis, Maritime Law Deskbook 189 (1988) (hereinafter Deskbook) (noting that under a time charter the vessel owner "retains all control over management" of the vessel). Chesapeake's obligations extended to paying the wages of all officers and unlicensed crew members. *See, e.g.,* D.I. 105B, Ex. D

at 395, 432–33, 441 (Chesapeake's operating budgets); *see also* D.I. 112 at 7 ("the masters were employed by the owner not the charterer"); E. Ivamy, Dictionary of Shipping Law 159 (1984) (hereinafter Shipping Law) (Under a time-charter, "the shipowner exercises his rights through the master and crew who are employed by him."). However, the relationship among Chesapeake, the KPC corporate group and the Kuwaiti government is, perhaps, best summed up by a statement made by Chesapeake's counsel at the Kuwait Oil Tanker Hearings:

> Mr. Bateman: So Chesapeake is in a sense an extension of the Government of Kuwait?
>
> Mr. Schlefer: It is controlled by the Government of Kuwait, that is true.

*Kuwaiti Tankers* at 107. As discussed below, Chesapeake retained little responsibility for directing and managing either itself or the eleven re-flagged oil tankers.

Chesapeake engaged Gleneagle to manage the eleven ships. *See* D.I. 71B at

*Arrows point from the entity engaging services and towards the entity providing services.*

---

**8.** KOTC purchased all of Chesapeake's outstanding stock in exchange for $1000 and the eleven oil tankers. *See* D.I. 112 at 3.

**9.** Seven of Chesapeake's fourteen officers and directors were also officers or directors of Santa Fe. At least three of Chesapeake's officers were also officers or directors of KOTC.

A371. As manager, Gleneagle was responsible for purchasing supplies, fuel, food, repairs, customs entry and exit clearances, and other services. *See id.* at A372. Certain additional services could be requested by Chesapeake. *See id.* at 375–77. Pursuant to this last provision, Chesapeake requested Gleneagle to provide United States Citizen Masters and Radio Officers. *See id.* at 333–34.

The Chesapeake/Gleneagle Management agreement, however, permitted Gleneagle to appoint sub-managers to fulfill its obligations. *See id.* Under that provision of the management agreement Gleneagle appointed KOTC, Chesapeake's parent corporation, as sub-manager. *See id.* at 399; *supra* note 7. KOTC was made responsible for all management of the tankers except, as previously noted, the employment of the ships' masters and radio officers. *See id.* at 402–03; *see also* D.I. 79 at 4 ("[KOTC]'s engagement and employment of plaintiffs as seamen...."). Gleneagle denies its duties included "hiring management, employment, or pay of Filipino or other foreign seaman in the crews of these vessels." D.I. 70 at 1. A letter from one of the ship's masters to Gleneagle indicates the contrary: "The Master's job is far more complicated than on any American Flag ship. All provisions are purchased by the Master for cash. The Phillapino [sic] Ratings are paid monthly in cash.... I have already discharged five crew members and signed on their replacements." D.I. 105C, Ex. G, attachment E (July 29, 1987, letter from J. Roach, Master of the Gas Princess, to J. Lovell, Vice President Gleneagle); *see also* D.I. 79 at 7 ("Plaintiffs' wages were paid by remittance to the Philippines and in cash on board ship.").[10]

Similarly, Chesapeake entered into a Management Services Agreement with Santa Fe. *See* D.I. 105B, Ex. D. at 223. Under this agreement, Santa Fe provided Chesapeake legal, maritime compliance, tax, financial, and other miscellaneous services. *See id.* at 226. Additionally, the contract permitted Chesapeake to employ as its Officers and Directors employees of Santa Fe. *See id.* Pursuant to this latter provision, half of Chesapeake's corporate officers and directors were also employees of Santa Fe. *See supra* note 9 and accompanying text. Thus, Chesapeake was left with little to do for itself, as indicated by a Santa Fe internal memo: "Time Charter, Management and Operating Agreements have been prepared and signed by officers of Chesapeake Shipping covering substantially all company operations." D.I. 105B, Ex. D at 170.

### D. The Plaintiffs and Philippine Regulation

As noted at the outset, this matter arises out of a Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, ("FLSA") suit, that was originally brought by eighteen Philippine seamen as a class action, for recovery of minimum wage payments. To date, 228 Philippine seamen ("Plaintiffs") have opted-in as members of the plaintiff class. *See* D.I. 121.[11] Plaintiffs are all Philippine citizens, and were the crew members of the eleven Kuwaiti oil and liquefied gas tankers that were re-flagged under the flag of the United States.

Collective bargaining agreements negotiated between Naess and the Associated Marine Officers' & Seaman's Union of the Philippines—PTGWO—ITF, prior to the re-flagging of the vessels set wage rates, *see* D.I. 71A at A147–A149, governed the em-

10. Gleneagle argues that the term "discharge" in the cited letter refers to "a ministerial act in recording the discharge of seamen rather than a managerial act of terminating their employment." D.I. 113 at 9. No affidavit supports this contention. Further, Gleneagle contends that United States law requires the issuance of a certificate of discharge or an entry in a continuous discharge book. *See id.* at n. 5 (citing 46 U.S.C. § 7302). Gleneagle does not explain why

Philippine seamen would have continuous discharge books conforming to United States law. Finally, Gleneagle does not allege that the Philippines has discharge documentation procedures analogous to those of the United States.

11. Class actions brought pursuant to the FLSA are "opt-in" in nature. *See* 29 U.S.C. § 256.

ployment relationship. *See, e.g.,* D.I. 71A at A141 ("In case of conflict between the provisions of the individual employment contract of the seaman and that of this Collective Bargaining Agreement, the provisions of this Collective Bargaining Agreement shall be upheld and prevail over that of the individual employment contract."). The labor contract includes a grievance procedure, and states that the law of the Philippines governs the rights and responsibilities of the parties. *See* D.I. 71B at 436. The labor contract also grants the Philippine Overseas Employment Administration ("POEA"), an agency of the government of the Philippines, "original and exclusive jurisdiction over any and all disputes … arising out of" the agreement. D.I. 71B at 436.

In this regard, all hiring of Filipino citizens by foreign employers must be done through the POEA. *See* D.I. 71B at A576. The POEA has promulgated extensive rules and regulations controlling all overseas employment. *See generally* D.I. 71B at A555, *et seq.* The purpose of these regulations is to:

    a. promote and develop overseas employment opportunities in cooperation with relevant government institutions and the private sector;

    b. establish the environment conducive to the continued operations of legitimate and responsible private agencies; and,

    c. afford protection to Filipino workers and their families, promote their interests and safeguard their welfare.

*Id.* at 559. To effectuate these policy goals, the POEA regulates principals and projects; recruitment, advertisement and placement; contract processing and travel documentation; employment standards; the filing of grievances; and provides worker assistance and welfare services.

In sum, one of the primary reasons the ships have any United States contact, namely the flying of the American flag, is to protect American interests in the Per-

sian Gulf. Further, there is no allegation that any Plaintiff has ever been to the United States and no suggestion on the record that any Plaintiff has any connection to the United States. This matter concerns, therefore, foreign citizens who signed employment contracts in the Philippines, pursuant to Philippine law and regulation, working on ships that, during the relevant time period, never called at a port in the United States or the port of a United States possession. Additionally, the collective bargaining agreement was entered into before the ships flew the United States flag, and is regulated by an arm of the government of the Philippines.

### E. Status of the Case

The Court held a status conference on November 3, 1989,[12] and on November 6, 1989, issued an Omnibus Order. *See* D.I. 45. In relevant part, that Order directed all Defendants to file case dispositive motions on or before November 20, 1989. Pursuant to that directive, Chesapeake and Gleneagle filed a joint motion to dismiss, or alternatively, for summary judgment, contending that the FLSA does not apply to the crews of the eleven tankers and that the complaint should be dismissed on the grounds of *forum non conveniens. See* D.I. 54. All Defendants have joined or adopted the joint Chesapeake/Gleneagle motion. In addition, Gleneagle filed a separate motion for summary judgment claiming that it was not an employer of the plaintiffs and that it therefore could not be held liable under the FLSA. *See* D.I. 55. Similarly, Santa Fe filed a motion for summary judgment asserting that it too was not an employer of the plaintiffs. *See* D.I. 53. KOTC and KPC filed motions to dismiss alleging that they are not subject to this Court's jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–1611, and that there is "lack of jurisdiction over the person, and insufficiency of service of process." *See* D.I. 56 at 2; D.I. 58 at 2.

---

**12.** The plaintiffs and Chesapeake, Gleneagle, Santa Fe, KPC (U.S. Holdings), and KPC were represented at the conference.

The Court will grant the Chesapeake/Gleneagle motion for three reasons. First, choice of law analysis shows that Philippine, not American, law is applicable to this case, and Plaintiffs have not alleged a violation of the law of the Philippines. Second, Plaintiffs have not shown that they are entitled to the minimum wage pursuant to Section 6 of the FLSA. Finally, the Court determines that the foreign workplace exception, Section 213(f) of the FLSA, applies to the seamen on the re-flagged tankers.[13] The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To resist Defendants' motions for summary judgment, Plaintiffs must come forward with sufficient specific facts to establish a genuine factual issue for trial. "Where the full record, taken together, could not lead a rational trier of fact to find for the non-moving party, no genuine issue exists for trial." *United States v. One 107.9 Acre Parcel of Land*, 898 F.2d 396, 398 (3d Cir. 1990) (relying on *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The Court notes, however, that it is the moving parties' burden to "prov[e] that no genuine issues exist as to any material fact," *Miller v. Eichleay Engineers, Inc.*, 886 F.2d 30, 35 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)), and that all ambiguities and reasonable inferences must be resolved in favor of the non-moving party. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976); *Wilmington Housing Authority v. Pan*

*Builders, Inc.*, 665 F.Supp. 351, 351 (D.Del. 1987).

The underlying substantive law identifies those facts which are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determining the applicable substantive law is, therefore, the initial inquiry when ruling on a motion for summary judgment. *See Dunleavy v. Dugan*, No. 88–57, slip op. at 7, 1990 WL 49421 (D.Del. Apr. 20, 1990).

### B. Choice of Law

Plaintiffs contend that the FLSA governs the present dispute. This act, in pertinent part, states that:

(a) Every employer shall pay to each of his employees who in any work-week is engaged in commerce ... or is employed in an enterprise engaged in commerce [the minimum wage].

. . . .

(4) if such employee is employed as a seaman on an American vessel, not less than the rate which will provide ... for the period covered ... wages equal to [the minimum wage].

29 U.S.C. § 206(a) and (a)(4). The FLSA defines "commerce" as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b). An "enterprise engaged in commerce" is "an enterprise which has employees engaged in commerce ... or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce." 29 U.S.C. § 203(s).

Defendants argue, relying on *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) and *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), that United States law does not apply. Both *Lauritzen* and *Rhoditis* concerned the application of the Jones Act, 46 U.S.C. § 688, to foreign seamen serving on foreign flagged vessels. Together, the two cases provide an eight

---

**13.** Because the Court finds the joint Chesapeake/Gleneagle motion to be case dispositive, it is unnecessary for the Court to address the other motions filed by the Defendants.

factor test used to determine whether the United States has sufficient interest in an admiralty controversy for American courts to apply United States law. *See de Alvarez v. Creole Petroleum Corp.*, 462 F.Supp. 782, 785 (D.Del.1978); *see also Rhoditis*, 398 U.S. at 309 n. 4, 90 S.Ct. at 1734 n. 4 (" '[T]he decisional process ... involves the ascertainment of facts ... which constitute contacts between the transaction involved ... and the United States, and then deciding whether or not they are substantial.' ") (citation omitted)); *De Mateos v. Texaco, Inc.*, 562 F.2d 895, 900 (3d Cir.1977) (holding that the purpose of the *Lauritzen–Rhoditis* test is to determine whether there is a sufficient American interest to apply American law).

■ Although Plaintiffs resist the application of the *Lauritzen–Rhoditis* test, it is applicable to all maritime actions. *See Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); *Gulf Trading & Transp. Co. v. Vessel Hoegh Shield*, 658 F.2d 363, 366 (5th Cir.1981); *Cliffs–Neddrill Turnkey International–Oranjestad v. M/T Rich Duke*, 734 F.Supp. 142, 148 (D.Del.1990); *Swedish Telecom Radio v. M/V Discovery I*, 712 F.Supp. 1542, 1545 (S.D.Fla.1989). The eight factors included in the *Lauritzen–Rhoditis* test are: the place of the wrongful act, the law of the flag, allegiance or domicile of the injured, allegiance of the defendant shipowner, place of contract, accessibility of a foreign forum, the law of the forum, and the shipowner's base of operations. *See Lauritzen*, 345 U.S. at 583–93, 73 S.Ct. at 928–33; *Rhoditis*, 398 U.S. at 309, 310, 90 S.Ct. at 1734, 1734; *De Mateos*, 562 F.2d at 900–01.

■ In this case the place of the wrongful act is either the Philippines, where the employment contract was entered into, or in Kuwait, Europe and Japan, where the seamen were paid. Either determination indicates the inapplicability of American law. The law of the flag favors applying the law of the United States, as does the

law of the forum. The allegiance of the seamen is to the Philippines. Construed most favorably to the Plaintiffs, the allegiance of the shipowner is divided between the United States and Kuwait. The seamen, pursuant to their employment contracts, have access to a forum in the Philippines. Finally, the base of operations of the shipowner is in Kuwait.

In balancing these factors, a court should "attempt[ ] to avoid or resolve conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." *Lauritzen*, 345 U.S. at 582, 73 S.Ct. at 928. The above factors must be evaluated "in light of the national interest served by the assertion" of federal jurisdiction. *Rhoditis*, 398 U.S. at 309, 90 S.Ct. at 1734. The significant points of contact giving rise to this dispute are not in the United States. Indeed, the collective bargaining agreement governing the wages of the plaintiffs was entered into before there was *any* point of contact with the United States. The only American national interest in this situation is to safeguard the United States security and foreign policy objectives in the Persian Gulf. Under the *Lauritzen–Rhoditis* test American law does not apply.[14]

The application of the *Lauritzen–Rhoditis* test is required when a claim is brought under the Jones Act because "the Jones Act itself does not define its jurisdictional reach." *Papaioannoiu v. Hellenic Lines, Ltd.*, 569 F.Supp. 724, 726 (E.D.Pa.1983). That statute states: "Any seaman who shall suffer personal injury in the course of his employment may ... maintain an action for damages...." 46 U.S.C. § 688. By a literal application of its terms, the Jones Act could be interpreted as "extend[ing] our law and open[ing] our courts to all alien seafaring men injured anywhere in the world...." *Lauritzen*, 345 U.S. at 577, 73 S.Ct. at 925. In *Lauritzen*, however, the Supreme Court noted in

---

**14.** The Plaintiffs have not alleged a violation of Philippine or Kuwaiti law, or a breach of their employment contracts.

passing that the Jones Act Congress did not write on a "clean slate." *Id.* Instead, the Supreme Court held, Congress intended that the federal courts apply a "seasoned body of maritime law" that "reconcil[es] our own with foreign interests...." *Id.* Similarly, the Third Circuit has noted that the purpose of the *Lauritzen–Rhoditis* test is to bring the broad language of the Jones Act within both international law and constitutional bounds. *See De Mateos,* 562 F.2d at 900 (noting both international law and fifth amendment concerns); *see also Papaioannoiu,* 569 F.Supp. at 726–27.

This inquiry is particularly appropriate to the present case. The application of the American minimum wage to the crews of the eleven re-flagged tankers would directly conflict with Philippine regulations designed to promote the economic and societal interests of the Philippines. Such a conflict should be avoided. In *Windward Shipping (London) Ltd. v. American Radio Association, AFL–CIO,* 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974), the Supreme Court held that the traditional deference granted to the historical "principles of comity and accommodation in international trade" is appropriate when construing American labor protective statutes. *See id.* at 113, 94 S.Ct. at 964. The evaluation of the *Lauritzen–Rhoditis* criteria reveals that the only appropriate reconciliation of "our own with foreign interests" is to conclude that American law does not apply to these Philippine seamen.

### C. Fair Labor Standards Act Coverage

Unlike the Jones Act, however, the FLSA is self-limiting on its face. It does not profess to apply to all seamen on the high seas. The minimum wage requirements of the FLSA govern American-flagged vessels that are in commerce. *See* 29 U.S.C. § 206(a) and (a)(4). Thus, some of the concerns that led to the formulation of the *Lauritzen–Rhoditis* test are lacking when

construing the FLSA.[15] The Court will, alternatively, address the application of the FLSA to these Plaintiffs.

If the FLSA applies, does Section 206 require the payment of the American minimum wage to the crews of the eleven re-flagged oil tankers? Plaintiffs argue that "[t]he Fair Labor Standards Act expressly covers 'seamen on American vessels ... no matter where they are located.' " D.I. 105 at 2. In reaching this conclusion the Plaintiffs disregard the express terms of the Act. As Plaintiffs correctly note, the FLSA did not originally cover seamen. Congress amended the Act in 1961 to extend minimum wage coverage to approximately 100,000 seamen. *See* H.R.Rep. No. 75, 87th Cong., 1st Sess. 14 (1961). The amended statute, however, cannot be fairly read to provide minimum wage coverage to *every* crewmember on *every* American vessel.

#### 1. The Commerce Requirement

■ First, Plaintiffs have not shown that they are entitled to the minimum wage under Section 206. The introductory clause to the 1961 amendment expanding minimum wage coverage to seamen states: "if *such* employee is employed as a seaman on an American vessel...." 29 U.S.C. § 206(a)(4) (emphasis added). "Such" refers to a previously specified class, *see* Black's Law Dictionary 1284 (5th ed. 1979); Oxford English Dictionary 3136 (1971), in this case the class of employees who are in commerce or work for an enterprise engaged in commerce. *See* 29 U.S.C. § 206(a). Congress' use of the term "such" restricts the application of a provision to those individuals included in the referred to class. *See, e.g., United States v. Bowen,* 100 U.S. 508, 512, 25 L.Ed. 631 (1879). Indeed, the Plaintiffs cite to a Department of Labor regulation that assumes the "in commerce" requirement applies to seamen. *See* 29 C.F.R. § 783.42 ("[I]t clearly would not comport with the remedi-

---

**15.** In this regard, the Supreme Court's opinion in *Windward Shipping* may be instructive. *Windward Shipping* construed the scope of the "commerce" requirement of the Labor Manage-

ment Relations Act, 29 U.S.C. §§ 152(b), 160(c). The *Windward* court cited *Lauritzen,* but did not rely on the factors of the *Lauritzen–Rhoditis* test.

al purpose of the Act to exclude from its minimum wage provisions *seamen engaged in commerce* or in the production of goods for commerce....") (emphasis added). The use of the phrase "such employee" in the FLSA contrasts sharply with terms used by Congress when an Act is intended to be all-encompassing. For example, the Seamen's Act applied to "[e]very seaman on a vessel of the United States...." 46 U.S.C. § 597 (repealed 1983). Accordingly, the plain meaning of Section 206 restricts application of the minimum wage to seamen on American vessels either in commerce or employed in an enterprise engaged in commerce.

The plain meaning of a statute is conclusive except in rare cases when such an interpretation yields a result "demonstrably at odds with the intention of the drafters." *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *accord Burlington Northern Railroad Co. v. Oklahoma Tax Commission*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1859–1860, 95 L.Ed.2d 404 (1987); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982). There is nothing in the history of the 1961 amendment exhibiting a Congressional intent to extend FLSA coverage to workers not in commerce. The stated purpose of the amendment was "to amend the Fair Labor Standards Act ... to provide coverage for employees ... of ... *employers engaged in commerce or in the production of goods for commerce....*" Fair Labor Standards Amendments of 1961, Pub.L. No. 87–30, 75 Stat. 65 (1961) *reprinted in* 1961 U.S.Code Cong. & Admin.News 71 (emphasis added); *see also* 29 U.S.C. § 202(a) ("The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce....").

Accordingly, "the focal center of [FLSA] coverage is 'commerce.'" *Mitchell v. H.B. Zachry Co.*, 362 U.S. 310, 321, 80 S.Ct. 739, 746, 4 L.Ed.2d 753 (1960). Plaintiffs' contention, that because safety and documentation laws apply to these vessels the FLSA should also apply, is unpersuasive. *See* D.I. 105 at 16–19. These statutes and regulations have no commerce requirement restricting their applicability, while the FLSA does. In this regard, it is important to remember that "the scope of the Act is not coextensive with the limits of the power of Congress over commerce...." *Kirschbaum Co. v. Walling*, 316 U.S. 517, 523, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638 (1942). The fact that Congress chose to regulate vessels in some respects does not necessarily mean it chose to regulate the wages paid to their crews.

In order to prevail under the FLSA, the crewmembers must either themselves be "engaged in commerce" or be employed "in an enterprise engaged in commerce." An enterprise is engaged in commerce only if it "has employees engaged in commerce ... or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce...." 29 U.S.C. § 203(s). These two alternative prerequisites for FLSA coverage will be considered separately.

### 2. Are the Seamen in Commerce?

As noted above, commerce under the FLSA requires trade "between any State and any place outside thereof." 29 U.S.C. § 203(b). It is uncontested that no member of the Plaintiff class has been to the United States and that during the relevant period not one of the eleven tankers entered a United States port. Plaintiffs contend that a ship is considered part of the territory of the nation of the flag it flies, *see, e.g., Lauritzen*, 345 U.S. at 585, 73 S.Ct. at 929, and that all trading done by American-flagged vessels is, therefore, in commerce. The "ship as territory" terminology is a mere legal fiction, and metaphor, employed by courts to resolve choice of law questions, particularly when vessels are on the high seas. *See, e.g., Lauritzen*, 345 U.S. at 583, 585, 73 S.Ct. at 928, 929; *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 123–24, 43 S.Ct. 504, 507–08, 67 L.Ed. 894 (1923); Restatement (Third) of Foreign Relations Law § 502, Reporters' Note 3; *see also id.* at § 402(h) ("The application of law to activities on board a state's vessels ... has sometimes been supported as an exten-

sion of the territoriality principle but is better seen as an independent basis of jurisdiction."). Even were Plaintiffs' contention literally true under all circumstances, it would be insufficient to bring these seamen within the purview of the FLSA.

A "State" is defined by the Act as "any State of the United States or the District of Columbia and any Territory or possession of the United States." 29 U.S.C. § 203(c). This definition is a limited one. Indeed, a judicial attempt to expand FLSA coverage resulted in an amendment to the Act clarifying its scope. In *Vermilya–Brown Co., Inc. v. Connell*, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76 (1948), the Supreme Court held that the FLSA applied to construction workers on an American military base in Bermuda. *See* 335 U.S. at 386–390, 69 S.Ct. at 145–147. Prior to the *Vermilya–Brown* decision, Congress had not "fully appreciated" the possible scope of the Act. 1957 U.S.Code Cong. & Admin.News 1756, 1757 (reprinting S.Rep. No. 987, 85th Cong., 1st Sess. (1957)). Once Congress did fully appreciate the Act's possible scope, Section 213(f) was added to the FLSA "to exclude from any possible coverage ... work performed by employees within a foreign country." *Id.* at 1756.[16] Surely if Congress did not intend property for which the United States holds a ninety-nine year lease to be considered a territory or possession under the FLSA, vessels owned and operated by a private corporation should not be deemed a territory or possession under the FLSA. *See also infra* discussion construing 29 U.S.C. § 213(f).

Given Congress' intent, as exemplified by the declaration of policy of the FLSA, *see* 29 U.S.C. § 202(a) (purpose of Act is to regulate commerce), the definition of commerce incorporated in the Act, and the addition of Section 13(f), the Court finds that the terms "territory" and "possession," as used in the FLSA, are limited to "the regional areas—of land and adjacent waters—over which the United States claims and exercises dominion and control as a sovereign power.... [The terms] refer[ ] to areas or districts having fixity of location and recognized boundaries." *Cunard S.S. Co.*, 202 U.S. at 122, 43 S.Ct. at 507. Oil tankers do not fall within this definition.

Also instructive is the scope of other labor protective statutes. The Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*, has the same "in commerce" requirement as the FLSA, and the jurisdictional reach of one is persuasive as to the reach of the other. *See McLeod v. Threlkeld*, 319 U.S. 491, 495, 63 S.Ct. 1248, 1250, 87 L.Ed. 1538 (1943); *Bartell v. Walling*, 327 U.S. 463, 466 n. 5, 66 S.Ct. 631, 633 n. 5, 90 L.Ed. 786 (1946); 45 U.S.C. § 51. The FELA has no extraterritorial effect. *See New York Cent. R. Co. v. Chisholm*, 268 U.S. 29, 45 S.Ct. 402, 69 L.Ed. 828 (1925); *Boak v. Consolidated Rail Corp.*, 850 F.2d 110 (2d Cir.1988). The Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, has an analogous reach[17] and does not cover employees who perform their jobs entirely outside of the United States. *See Vollmar v. CSX Transportation, Inc.*, 705 F.Supp. 1154, 1164–65 (E.D.Va.1989); *Local 553 Transport Workers v. Eastern Air Lines*, 544 F.Supp. 1315, 1322 n. 1 (E.D.N.Y.1982) ("[T]he RLA does not require airline carriers to recognize unions as representatives of flight attendants who are foreign nationals, based abroad, and who fly on flights wholly outside the United States and its possessions."); *Air Line Stewards and Stewardesses Ass'n v. Trans World Airlines, Inc.*, 173 F.Supp. 369, 378 (S.D.N.Y. 1959) (same). Finally, the coverage of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, is also persuasive

---

**16.** 29 U.S.C. § 213(f) states that: "The provisions [concerning the minimum wage, maximum hours, child labor, and enforcement] shall not apply with respect to any employee within a foreign country...."

**17.** The RLA's jurisdiction is equal to that of the Interstate Commerce Commission. *See* 45 U.S.C. § 151. That jurisdiction is "over transportation ... to the extent ... the transportation is in the United States and is between a place in—a State and a place in another State ... a State and a place in a territory or possession of the United States ... the United States and a place in a foreign country." 49 U.S.C. § 10501(a)(2).

as to the breadth of the FLSA, *see Rutherford Food Corp. v. McComb*, 331 U.S. 722, 723, 67 S.Ct. 1473, 1473, 91 L.Ed. 1772 (1947), although the NLRA is more far-reaching. *See Schroepfer v. A.S. Abell Co.*, 48 F.Supp. 88, 96 (D.Md.1942) ("[A]s has often been pointed out, the expression of congressional will is more broadly stated in the National Labor Relations Act ... than in the Fair Labor Standards Act...."), *aff'd*, 138 F.2d 111 (4th Cir. 1943), *cert. denied*, 321 U.S. 763, 64 S.Ct. 486, 88 L.Ed. 1060 (1944). Because the Supreme Court's holding in *Windward Shipping*, that the "clear congressional purpose [was] to apply the [Labor Act] only to American workers and employers," would preclude application of the NLRA to the plaintiffs in this case, the FLSA also should not apply. *See Windward Shipping*, 415 U.S. at 110, 94 S.Ct. at 963.

### 3. Enterprise Liability

■ Having determined that the Plaintiffs themselves are not in commerce, the next question is whether they are employed by an enterprise engaged in commerce. The enterprise in question exists for the transportation of oil from the Persian Gulf in international trade. *See* 29 U.S.C. § 203(r) (" 'Enterprise' means the related activities performed ... for a common business purpose....").[18] The plaintiff seamen contend that a number of isolated activities are sufficient to bring Defendants within enterprise coverage under the Act. Plaintiffs note that one of the re-flagged tankers made a one time shipment of oil to Coastal Texaco and Chevron in Europe for later delivery to the United States. *See* D.I. 105 at 34 n. 15. During the calendar year 1988 KOTC purchased supplies from United States suppliers to retrofit the eleven ships to meet American safety regulations. *See id.* at 36. Plaintiffs cite the initial transference of title from KOTC to Chesapeake, the subsequent contracts among Chesapeake, Gleneagle, and KOTC,

and the fact that Chesapeake maintains a California bank account and pays income tax. *See id.* at 34, 36–37. The tankers were able to communicate via satellite with Santa Fe offices in California and Gleneagle in Houston. *See id.* at 36.[19] Additionally, Chesapeake's annual budget reflects the payment of the officers' and crews' wages, *see* D.I. 105B at 389, 395, although Plaintiffs do not contest Defendants' claim that the wages were paid out of Kuwait. *See* D.I. 71 at 27.

The seamen have failed to show that Defendants constitute an enterprise engaged in commerce within the meaning of the FLSA. 29 U.S.C. § 203(s) states that an

> [e]nterprise engaged in commerce or in the production of goods for commerce means *an enterprise which has employees engaged in commerce* or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce.

First, the Plaintiffs have failed to point to, and therefore failed to raise a triable issue of fact, as to any employee or group of employees linked to trade "between any State and any place outside thereof." Second, while no *de minimis* rule applies, in order for FLSA coverage to attach there must be some regular or recurring contact with commerce. *See Mabee v. White Plains Publishing Co.*, 327 U.S. 178, 181, 66 S.Ct. 511, 512, 90 L.Ed. 607 (1946); *Marshall v. Victoria Transportation Co., Inc.*, 603 F.2d 1122, 1124 (5th Cir.1979); *Donovan v. Micro–Chart Co.*, 653 F.Supp. 1159, 1163 (S.D.Ohio 1986); *Marshall v. Whitehead*, 463 F.Supp. 1329, 1358 (M.D.Fla. 1978). There is no evidence in the record showing that the enterprise of transporting oil from the Middle East to Europe and Japan had any routine links to commerce, as that word is defined by the FLSA. The

---

**18.** The Court will assume, *arguendo*, that all Defendants comprise this single enterprise.

**19.** Plaintiffs also claim that Chesapeake chartered two ships, the Ocean Wizard and the Ocean Runner, from Belmont, an American corporation. *See* D.I. 34. The interrogatory cited in support of this claim mentions neither Belmont nor the Ocean Wizard. *See* D.I. 105C at Exhibit I, Chesapeake Second Interrogatory No. 13.

transfer of oil, in Europe, to two American companies was a one time affair. Similarly, once the supplies to retrofit the tankers were shipped there were no further commercial contacts with the United States. Also, the contractual arrangements among the defendants were all signed outside of the United States and pertained to commercial activity the performance of which was wholly outside America.

Finally, the payment of wages and a satellite link do not constitute commerce within the meaning of the Act. First, Plaintiffs have not contested the fact that the wages were paid from Kuwait and not the United States. Second, in the Third Circuit, communications, contracts, and the like, that are internal to the enterprise do not constitute commerce within the meaning of the Act. *See Stevens v. Welcome Wagon International, Inc.,* 390 F.2d 75, 78 (3d Cir.1968) (interstate postal communications do not constitute commerce); *Brennan v. Apartment Communities Corp.,* 360 F.Supp. 1255, 1262 (D.Del.1972) (interoffice transactions do not constitute commerce); *see also Billeaudeau v. Temple Associates,* 213 F.2d 707 (5th Cir.1954), *cert. denied,* 348 U.S. 959, 75 S.Ct. 451, 99 L.Ed. 749 (1955).

### D. The Foreign Workplace Exemption

■ Section 13(f) of the FLSA, 29 U.S.C. § 213(f), also precludes requiring the payment of the minimum wage to these seamen. This Section states that the minimum wage and maximum hour provisions "shall not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country...." 29 U.S.C. § 213(f). Many courts have interpreted this section as meaning that the Act has *no* extra-territorial effect. *See, e.g., Lopez v. Pan Am World Services, Inc.,* 813 F.2d 1118, 1119, 1120 (11th Cir.1987); *Relis v. RFE/RL, Inc.,* 770 F.2d 1121, 1122–23 (D.C.Cir.1985); *Pfeiffer v. WM. Wrigley Co.,* 755 F.2d 554, 558–59 (7th Cir.1985); *Cleary v. United States Lines, Inc.,* 728 F.2d 607, 609 (3d Cir.1984) ("section 213(f) ... prohibits its extra-territorial application"). This characterization of the exemption is somewhat overbroad. On its face the exclusion only applies to work "within a foreign country." Although seamen *on the high seas* are "extra-territorial," they are not within a foreign country and they do not fall literally within the exception. *Cf. Pacific Merchant Shipping Ass'n v. Aubry,* 709 F.Supp. 1516, 1525 (C.D.Cal.1989) (FLSA section exempting seamen from overtime pay preempts state law "on the high seas and within the territorial zone").

Literally applied, therefore, the FLSA requires minimum wage payments for seamen on American vessels in territorial waters and on the high seas, but does not require such payments when these ships are in foreign territorial waters or in foreign ports. Under this analysis, a ship leaving from a United States port for Europe would be required to pay the minimum wage until it reached foreign territorial waters, and upon reaching foreign waters the minimum wage requirement would cease. This result is unsatisfactory, however, because it does not comport with the congressional intent to apply the minimum wage to trade from within a state to any point outside thereof. *See* 29 U.S.C. § 203(b).

Congress faced a similar question when it delineated the scope of the Shipping Act of 1984. The purpose of this Act is to provide an efficient and economic system of ocean commerce "that is, insofar as possible, in harmony with, and responsive to, international shipping practices...." 46 U.S.C.App. § 1701(2). Thus, unlike the FLSA, in passing the Shipping Act Congress addressed the peculiar needs of vessels that traveled between nations. In this regard, carrier agreements "relat[ing] to transportation to be performed within or between foreign countries" need not be filed with the Federal Maritime Commission. 46 U.S.C.App. § 1704(a). Similarly, activity concerning shipping within or between foreign countries are exempt from American antitrust laws "unless that ... activity has a direct, substantial, and reasonably foreseeable effect on the commerce of the United States." 46 U.S.C. App. § 1706(a)(3). Also enlightening is the

fact that Congress extended provisions concerning "Seamen Protection and Relief" to three types of voyages: between a port in the United States and a foreign port, *see* 46 U.S.C. § 10301(a)(1); between an American port in the Atlantic Ocean and an American port in the Pacific, *see* 46 U.S.C. § 10301(a)(2); and, between State ports. *See* 46 U.S.C. § 10501(a). No provision addresses voyages wholly between foreign countries and foreign ports.

These expressions of the Congressional will in the maritime sphere, where harmonizing American interests with those of foreign sovereigns and the demands of the international marketplace is of primary concern, demonstrate that only foreign to foreign voyages should fall within the foreign workplace exception of Section 213(f). Limiting Section 213(f) in this manner is in accord with the policy of interpreting FLSA exclusions narrowly. Further, this interpretation effectuates congressional intent to apply the minimum wage to employees engaged in foreign trade. Finally, and perhaps most significantly, this interpretation satisfies the constitutional and foreign policy related concerns expressed by the Supreme Court in *Lauritzen* and its progeny. *See* discussion *supra.* This construction of Section 213(f) insures that United States law will only be applied in situations where the American points of contact with a transaction predominate, and safeguards against "running interference" in the delicate field of international relations. *Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957). Even with this limited application of Section 213(f), however, the Plaintiffs fall within the exclusion; the minimum wage provisions do not apply to them.

█ This conclusion is supported by the analysis used in *Air Line Stewards Ass'n v. Trans World Airlines, Inc.,* 173 F.Supp. 369 (S.D.N.Y.), *aff'd,* 273 F.2d 69 (1959), *cert. denied,* 362 U.S. 988, 80 S.Ct. 1075, 4 L.Ed.2d 1021 (1960). In that case, the court concluded that the Railway Labor Act did not apply to foreign nationals, based abroad, on flights wholly outside the United States. In its analysis, the court

distilled a number of criteria considered by courts when determining the extra-territorial reach of a statute. The court considered:

(1) whether the statutory language is vague or explicit as to the reach of the statute; (2) whether the statutory policies underlying the legislation were deliberately and consciously shaped with the existence or peculiarities of the foreign area in mind; (3) whether the legislative history of the statute evinces any specific congressional intention with respect to the subject of extra-territoriality; (4) whether the vindication of the public policy to be subserved requires extra-territorial operation; (5) whether the extra-territoriality of the statute is necessary for the effective regulation of the actions of our citizens; (6) whether the defendant's acts were a device to evade the thrust of the statute by attempting to create a privileged sanctuary beyond our borders; (7) whether the legislation is a criminal statute or requires the upholding of the sovereign power of the United States; (8) whether the extra-territorial trade practices radiate unlawful consequences here notwithstanding that they were initiated or consummated outside the United States; (9) whether a substantial number of American citizens are within the extra-territorial area sought to be regulated; (10) whether the extra-territorial acts sought to be regulated occur on a geographical area over which the United States has some measure of territorial or legislative control, although the area is not within the sovereignty of the United States; (11) whether the same policies suited to the United States are adaptable to the local conditions of the foreign area; (12) whether the defendant's particular operations and their effects were confined within the territorial limits of a foreign nation; (13) whether the rights of other nations or their nationals may be infringed; (14) whether the alleged violation of the statute is grounded on a foreign nation's sovereign acts; (15) whether the extra-territorial operation of the statute would impugn foreign law or tend to interfere with the sovereignty,

institutions, social conditions or commercial practices of another nation; (16) whether the defendants or other persons whose conduct is to be directly affected are American citizens or foreign nationals, or residents of the United States or some other country.

*Air Line Stewards,* 173 F.Supp. at 377–78.

In the present case, the FLSA clearly does not apply to work within foreign countries. The FLSA was not shaped with "the existence or peculiarities of foreign" law in mind. The legislative history of the Act indicates that Congress did not intend to make the minimum wage apply to foreign citizens in foreign countries. The congressional purpose of protecting American workers in commerce would not be furthered by extending the minimum wage to these Filipino seamen, while application of the FLSA in this case is not necessary to regulate or protect "our citizens." The Defendants did not form Chesapeake "to evade the thrust" of the FLSA. Indeed, Chesapeake was formed, at the urging of the American government, to further the foreign policy goals and national security of the United States. Further, the Plaintiffs can point to neither any unlawful consequences in the United States emanating from Defendants' activities, nor to "a substantial number of American citizens" who will be left without FLSA protection from this construction of the Act.

Most importantly in this case, application of the FLSA in the manner urged by the Plaintiffs would intrude on the sovereignty of the Philippines in regulating its workforce, and apply policies that are particularly suited to the United States and not "adaptable to the local conditions of the foreign area." Applying the United States minimum wage to these seamen would put American law in direct conflict with the pervasive regulation of the Plaintiffs' employment by the Philippine government. As the *Air Line Stewards* court concluded, where "the alleged violation of the statute is grounded on a foreign nation's sovereign acts," American law should not be given extra-territorial effect. Enforcing the minimum wage in this situation "would impugn foreign law ... [and] interfere with

the sovereignty, institutions [and] commercial practices" of the Philippines. Consequently, Section 213(f) bars the application of the minimum wage requirement to the Filipino crewmen on the eleven oil tankers.

## III. CONCLUSION

Plaintiffs have not shown that the commercial activity of any Defendant "is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than" entirely engaged in foreign commerce without connection to the United States economy. *Mitchell v. Vollmer & Co.,* 349 U.S. 427, 429, 75 S.Ct. 860, 861, 99 L.Ed. 1196 (1955). In order to avoid disrupting foreign economies, a connection to the American economy is critical to a finding of FLSA coverage. *See* 1957 U.S.Code Cong. & Admin. News 1756–57 (reprinting S.Rep. No. 987, 85th Cong., 1st Sess. (1957)). Ignoring this vital link would impose the American minimum wage on countries whose "labor conditions ... [are] wholly dissimilar to those in the United States," and would intrude upon affairs "which are the primary concern of a foreign country." *Foley Brothers v. Filardo,* 336 U.S. 281, 286, 69 S.Ct. 575, 93 L.Ed. 680 (1949). The lack of a link to our economy, combined with the extensive Philippine regulation of the wages and working conditions of these seamen, demonstrates that it would be entirely inappropriate to apply the FLSA in this case. Such an application would cause an "outright collision between domestic and foreign law ... [and be] a potential source of friction between the United States" and the Philippines. *Pfeiffer v. WM. Wrigley Jr. Co.,* 755 F.2d 554, 557 (7th Cir.1985). Similarly, due regard must be given to the Supreme Court's "reluctance to intrude domestic labor law willy-nilly into the complex considerations affecting foreign trade...." *Windward Shipping,* 415 U.S. at 110, 94 S.Ct. at 963. This admonition is particularly appropriate in this case where the foreign trade has no link to the American economy whatsoever. As in *Windward Shipping* and *Benz,* this Court recog-

nizes the clear congressional purpose to apply the FLSA to workers in the United States, *cf. Windward Shipping,* 415 U.S. at 110, 94 S.Ct. at 963, and is wary of the repugnance Congress has expressed to *any* extra-territorial application of this Act. *See Pfeiffer v. Wm. Wrigley Jr. Co.,* 755 F.2d 554, 558–59 (7th Cir.1985) (noting "[t]he hostility that Congress displayed to the courts' giving the [FLSA] any extraterritorial effect at all"). Accordingly, Defendants' motion for summary judgment will be granted.